**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BRITISH TELECOMMUNICATIONS PLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-366-VAC-CJB |
| | ) | |
| IAC/INTERACTIVECORP, MATCH | ) | |
| GROUP, INC., MATCH GROUP, LLC, and | ) | **JURY TRIAL DEMANDED** |
| VIMEO, INC | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, British Telecommunications plc ("BT") brings this action against Defendants: (i) IAC/INTERACTIVECORP, (ii) Match Group, Inc., (iii) Match Group, LLC, and (iv) Vimeo, Inc. (collectively referred to herein as "IAC"), and alleges as follows:

**Introduction**

1.              This is an action for patent infringement.  BT is a global communications company with a long history of cutting-edge advancements in the fields of data communications and information services.   BT has been and continues to be a pioneer in developing communication systems for transmitting data, including systems using wired, wireless, telephone, and internet communication technologies and related information services.  The BT patents involved in this case are directed to implementing and managing efficient and effective data communications over networks and improving the utility of information services, particularly in situations where the data communications and information services involve variations in persons, locations, things, and transmission quality.

2.          Defendants are closely related companies that operate as a single business entity controlled by IAC, selling information services, including numerous social media products/services.  The accused social media products/services are marketed and provided under the brands Match.com (a/k/a Match), OkCupid, Tinder, and Vimeo as detailed further herein.  Defendants, or their predecessor companies, direct and control these products that utilize and depend upon unauthorized use of BT's patented technology.  Defendants have misappropriated BT's patented technology without BT's permission and without compensating BT for the use of BT's technology.  This lawsuit seeks to hold the Defendants accountable for their unauthorized use and misappropriation of BT's technology – and to prevent them from continuing to use and misappropriate BT's technology – without BT's permission and without compensating BT.

3.          The BT patents asserted herein cover fundamental aspects of IAC's social media products/services, including Match.com, OkCupid, Tinder, and Vimeo.

4.          With respect to Tinder, for example, one of the asserted BT patents covers Tinder's geographical proximity-based identification of potential matches, which is a primary attraction for most Tinder users and a primary selling point for IAC in marketing the Tinder product/service.  Indeed, IAC's tagline for marketing Tinder is allowing users to "Meet new and interesting people nearby."   https://tinder.com/app/login.  *See* Fig. 1 (Tinder Mobile Application).



**Fig. 1.  Tinder Mobile Application**

5.          IAC's success with Tinder has caused IAC/INTERACTIVECORP and Match Group, Inc. to implement this identical patented product/service through their agents, including Match Group, LLC, under the names of "Mixer" on Match.com and the Quickmatch"/"Locals" on OkCupid.  "You can discover nearby singles by tapping on the ellipsis in the top left-hand corner and tapping on 'Discover.' By visiting Match.com's 'Discover' section, you will have two options: 'Stream' and 'Mixer.' The 'Stream' feature lets you scroll through as many profiles ***based on the members' location***. The 'Mixer' feature will let you browse through single profiles ***just like in the Tinder dating app***. You can swipe left to pass or swipe right to find a potential date and start connecting." https://heavy.com/tech/2014/07/how-to-use-match-dating-app-to-meet-new-singles/ (emphasis added).   OkCupid users describing their experiences with OkCupid's "Locals" product/service explained, "I just spent a few

minutes playing the 'locals' section of the iPhone app (the part of the app that's ***basically a***
***Tinder clone***).... The entire point is that it allows messaging based on mutual attraction, like
Tinder. ***It's based on geographic location of your mobile device***, not your zip code, like match
search. So when you are swiping people, you are swiping people that are some radius from your
physical                 location,                 not                 your                 plugged                 in                 zip                 code."
https://www.reddit.com/r/OkCupid/comments/1xsgin/whats_with_the_locals_section/ (emphasis
added).   Similarly, OkCupid explains that "Quickmatch on the app is ***based on a phone's***
***physical location*** rather than the location listed in the profile, so it will show people who are (or
recently were) near you, or near where you were, rather than people who necessarily live near
you." https://www.okcupid.com/help (emphasis added).

6.          Indeed, the geographical proximity-based identification of potential
matches has been so popular with users that IAC/INTERACTIVECORP and Match Group, Inc.
chose to implement this patented product/service by and through their agents, including Match
Group, LLC, directly via the home screens of their Match.com and OkCupid mobile phone
applications.   *See* Figs. 2 and 3 below.



Fig. 2.  Match.com Mobile
Application Home Screen

Fig. 3.  OkCupid Mobile
Application Home Screen

4

7.          Another BT patent asserted in this litigation covers methods used in Tinder with its Smart Photos product/service that alternates which of a user's photos Tinder first shows to prospective matches, tracks which of the user's photos have a better response (swipe right / yes vs. swipe left / no) from prospective matches, and then reorders the user's photos to present the "best" photo first.  Match Group, LLC (or its predecessor, Tinder, Inc.) claims that users of its Smart Photos product/service, "saw up to a 12% increase in matches." *See* Fig. 4 (http://blog.gotinder.com/introducing-smart-photos-for-the-most-swipeworthy-you/.)



Just tap the toggle to enable Smart Photos and Tinder will handle the rest.

**Fig. 4.  http://blog.gotinder.com/introducing-smart-photos-for-the-most-swipeworthy-you/**

8.        And another BT patent asserted in this litigation covers the methods used by OkCupid and Match.com to update their user profiles to improve the user's experience and to use the user's personal information to increase their success in finding suitable matches, which are essential selling features for OkCupid and Match.com.  See, e.g., www.match.com/cpx/en-us/match/IndexPage/ ("**#1 in dates,** relationships and marriages") (emphasis in original); www.okcupid.com/ ("Get noticed for who you are, not what you look like.").

9.        With respect to Vimeo, one of the asserted BT patents covers methods used by IAC to more efficiently authenticate and provide Vimeo media content creators with data visualizations that illustrate network access and usage statistics relating to how users access and consume a particular content creator's Vimeo content.  *See, e.g.,* Fig. 5 (https://vimeo.com/stats)



**Fig. 5.  https://vimeo.com/stats**

10.        Another of the asserted BT patents covers methods used by IAC for more efficiently providing Vimeo users with content that originates from multiple subscription services and delivering that content to a Vimeo user via a single portal where the user can access content for which the user has access rights.

11.     And yet another asserted BT patent covers methods used by IAC to maximize the quality of video presented to users who view Vimeo and Vimeo Live videos, which IAC uses as a major selling point for Vimeo. *See, e.g.,* Fig. 6 (www.vimeo.com) ("Host videos in the highest quality possible.")



**Fig. 6.  www.vimeo.com**

12.     Because of the fundamental nature of BT's patents to IAC's social media and video products/services, and IAC's success in building users, advertisers, and revenue based on IAC's misappropriation and unauthorized use of these patented products/services, BT's damages are substantial.  For example, the minimum damages which BT is entitled to receive for IAC's infringement is no less than a reasonable royalty based on the multiple billions of dollars in revenue IAC has generated from its past and ongoing infringing activities.

**Parties, Jurisdiction, and Venue**

13.   Plaintiff British Telecommunications plc is a corporation organized and existing under the laws of the United Kingdom.

14.  On information and belief, Defendant IAC/INTERACTIVECORP is a corporation organized and existing under the laws of the State of Delaware with corporate headquarters in New York City.

15.  IAC/INTERACTIVECORP represents to the public that all of the social media and video products/services at issue – Match.com, OkCupid, Tinder, and Vimeo – are "Our Brands." http://iac.com/brands.   Indeed, in Annual Reports to shareholders, as filed with the SEC, IAC/INTERACTIVECORP has repeatedly represented that all of the accused products and services at issue in this litigation are its own proprietary brands:

> ***IAC is a leading media and Internet company composed of widely known consumer brands, such as Match, Tinder,*** PlentyOfFish and ***OkCupid***, which are part of Match Group's online dating portfolio, HomeAdvisor and Angie's List, which are operated by ANGI Homeservices, as well as ***Vimeo***, Dotdash, Dictionary.com, The Daily Beast and Investopedia."

2017 IAC/INTERACTIVECORP Annual Report (March 1, 2018), p. 36 (emphasis added) ("*2017 Annual Report*").  *See also* 2016 IAC/INTERACTIVECORP Annual Report (Feb. 18, 2017), p. 2 ("*2016 Annual Report*").  These documents are available at IAC's Investor Relations website at the following addresses:

- *IAC 2017 Annual Report:*  http://ir.iac.com/static-files/66a65771-ec1c-480d-8e89-64d2d312d44c

- *IAC 2016 Annual Report:*  http://ir.iac.com/static-files/f45c1089-8879-4807-90b7-a892ecd04545

- *IAC 2014 Annual Report*:  http://ir.iac.com/static-files/75080000-f383-4bfc-9757-b1acf8cccb37

16.    Further, with respect to the dating products/services at issue in this litigation in particular, Match, Tinder and OkCupid, IAC/INTERACTIVECORP represented to the public and its shareholders that Match Group, Inc., and its subsidiaries are its agents in operating these dating services/products, through websites and applications that IAC/INTERACTIVECORP owns and operates:

> *Through Match Group, we operate a dating business* that consists of a portfolio of brands, available in 42 languages across more than 190 countries, including the following key brands: ***Tinder, Match***, PlentyOfFish, Meetic, ***OkCupid***, ….
>
> *Through the portfolio of brands within Match Group, we are a leading provider of subscription dating products servicing North America*, Western Europe, Asia and many other regions around the world. *We provide these services* through websites and applications that *we own and operate*.

*2017 Annual Report* at p. 71 (emphasis added); *see also 2016 Annual Report* at p. 4.

17.    Any question as to whether "we" "our" or "us" as used in these Annual Reports mean anything other than IAC/INTERACTIVECORP is dispelled by the specific definition that IAC/INTERACTIVECORP provides at the outset of all of its Annual Reports:

> *All references to "IAC," the "Company," "we," "our" or "us" in this report are to IAC/InterActiveCorp.*

*See, e.g., IAC 2017 Annual Report* at p. 2 (emphasis added). *See also IAC 2016 Annual Report,* p. 2 (same).    As such, these admissions establish IAC/INTERACTIVECORP's direct involvement and control in providing such infringing products/services through its agents/subsidiaries.

18.         In this regard, IAC/INTERACTIVCORP also represents to the public and shareholders that it, *per se*, offers the Match, OkCupid and Tinder apps at issue in this litigation (either directly or through its controlled agents and brands, Match Group, Inc., Match Group, LLC and Humor Rainbow, Inc.):

> ***We also offer access to our services*** via various mobile devices through ***our Match, OkCupid, Tinder*** and other branded mobile applications.

*IAC 2014 Annual Report*, p. 6 (emphasis added).

19.         Similarly, with respect to the Vimeo products/services at issue in this litigation, IAC/INTERACTIVECORP represents to the public and shareholders that it (IAC/INTERACTIVECORP) provides the relevant products/services to video creators:

> ***We offer*** basic video hosting and sharing services free of charge. For certain fees, ***we offer*** premium capabilities for creators, including: additional video storage space, advanced video privacy controls, video player customization options, team collaboration and management, review and workflow tools, lead generation, premium support and ***the ability to sell videos (on a subscription or transactional basis) directly to consumers in a customized viewing experience.***

*IAC 2017 Annual Report,* p. 8.  *See also IAC 2016 Annual Report*, pp. 6, 66.

20.         Further, IAC/INTERACTIVECORP acknowledges that it performs these accused functions through its controlled agent, Vimeo:

> ***Through Vimeo, we offer*** video creators simple, professional grade tools to share, manage, distribute and monetize content online, ***and provide viewers with a clutter-free environment to watch content across a variety of Internet-enabled devices, including mobile devices and connected television platforms***.

*IAC 2016 Annual Report,* p. 66.  *See also IAC 2017 Annual Report*, p. 8.

21.         IAC/INTERACTIVECORP also represents to the public and shareholders that it is responsible for marketing Vimeo's accused products/services, including through IAC/INTERACTIVECORP's proprietary website and mobile applications:

> **Marketing. We market Vimeo's services** primarily through online marketing efforts, including search engine marketing, social media, e-mail campaigns, display advertising and affiliate marketing, as well as through **our owned and operated website and mobile applications.**

*2017 IAC Annual Report*, p. 8 (emphasis added).  *See also IAC 2016 Annual Report,* p. 7.

22.     On information and belief, Defendant Match Group, Inc. is a corporation organized and existing under the laws of the State of Delaware.   Although Match Group, Inc. is incorporated separately from IAC/INTERACTIVECORP, Match Group, Inc. is controlled by and operates as a brand of IAC/INTERACTIVECORP.

23.     On information and belief, IAC/INTERACTIVECORP owns over 81% of Match Group, Inc.'s stock value, and controls over 97% of Match Group, Inc.'s voting rights. *2016 Annual Report of Match Group, Inc*., p. 8, and *2017 Annual Report of Match Group, Inc.,* p. 8   IAC/INTERACTIVECORP publicly represents and states that Match Group, Inc. is a subsidiary of IAC/INTERACTIVECORP. *IAC 2017 Annual Report*, Ex. 21.1; *see also IAC 2017 Annual Report, Ex. 21.1*.

24.     Like IAC/INTERACTIVECORP, Match Group, Inc. represents to the public and shareholders that Match, Tinder and OkCupid are its proprietary brands, operated by Match Group, Inc. and provided by Match Group, Inc. to meet the varying preferences of Match Group, Inc.'s users:

> Match Group (NASDAQ: MTCH) is the world's **leading provider of dating products**. **We operate a portfolio of brands, including Tinder, Match**, PlentyOfFish, Meetic, **OkCupid**, OurTime, and Pairs each designed to increase **our users'** likelihood of finding a meaningful connection. Through **our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users**. **We currently offer** our dating products in 42 languages across more than 190 countries.

Match Group 4Q 2017 Earnings Release, p. 12 (emphasis added) ("*Match Group, Inc. 4Q 2017 Release*").  The Match Group, Inc. 4Q 2017 Release is available on Match Group's Investor

Relations website at the following address: http://ir.mtch.com/static-files/4b8c3e80-5bfe-4185-a113-9fe17e3c59f3. "MTCH" is the stock ticker symbol for Match Group, Inc. https://www.bloomberg.com/quote/MTCH:US.

25.     Indeed, Mandy Ginsberg, Match Group, Inc.'s CEO, represented that in 2017, Match Group Inc. "introduced new products and features, particularly at Tinder, Match and OkCupid…." *Match Group, Inc. 4Q 2017 Release*, p. 1. Match Group, Inc. reports that its officers directly "oversee Match, Match Affinity Brands, PlentyOfFish, OkCupid," and others. https://www.streetinsider.com/Corporate+News/Match+Group+%28MTCH%29+Names+Elie+Seidman+as+Tinders+new+CEO/13513868.html.

26.     Match Group, Inc. states that it provides the technology and network systems that perform the steps for the Match.com, Tinder, and OkCupid products/services that infringe BT's patents:

> We also continually work to expand and enhance the efficiency and scalability of our technology and network systems to improve the experience of our users, accommodate substantial increases in the volume of traffic to our various dating products, ensure acceptable page load times for our dating products and keep up with changes in technology and user preferences."

*Match Group 2016 Annual Report*, p. 12; *Match Group 2017 Annual Report*, p. 13.

27.     Similarly, IAC/INTERACTIVECORP also states that it provides the technology and network systems that perform the steps for the Match.com, Tinder, and OkCupid, and Vimeo products/services that infringe BT's patents:

> We also continually work to expand and enhance the efficiency and scalability of our technology and network systems to improve the experiences of our users and customers, accommodate substantial increases in the volume of traffic to our properties, ensure acceptable page load times and keep up with changes in technology and user and customer preferences.

*IAC 2016 Annual Report*, p. 18 ; *IAC 2017 Annual Report*, p. 22 (same).

> **We receive, transmit and store a large volume of** personal information and other user **data** (including personal credit card data, as well as private content (such as videos and correspondence)) **in connection with the processing of search queries, the provision of online products and services**, transactions with users and customers and advertising on our websites.

*IAC 2016 Annual Report*, p. 20 (emphasis added); *IAC 2017 Annual Report*, p. 21 (same).

28.     IAC/INTERACTIVECORP promulgated the infringing products/services of the '040 Patent (Match.com's Mixer, OkCupid's Quickmatch and Locals and the basic functionality of Tinder) and the '105 Patent (Match.com's Daily Matches and OkCupid's quiz question) across and incorporated them into each of the dating business products/services that IAC /INTERACTIVECORP operates "[t]hrough Match Group [Inc.]" (*IAC 2017 Annual Report* at p. 71). Further, the accused products/service are among "the services" to which IAC/INTERACTIVECORP "offer access … via various mobile devices through our Match, OkCupid, Tinder and other branded mobile applications" (*IAC 2014 Annual Report*, p. 6). As such, officers of IAC/INTERACTIVECORP were necessarily responsible for product planning, introduction and marketing decisions implementing such infringing products/services.

29.     Further, as IAC/INTERACTIVECORP's controlled agent, Match Group, Inc. was directly responsible for promulgating the infringing products/services of the '040 Patent (Match.com's Mixer, OkCupid's Quickmatch and Locals and the basic functionality of Tinder) and the '105 Patent (Match.com's Daily Matches and OkCupid's quiz question) across and incorporating them into Match Group, Inc.'s "portfolio of trusted brands." All of this was done as part of Match Group, Inc.'s stated goal of "provid[ing] tailored products to meet the varying preferences of our users." *Match Group, Inc. 4Q 2017 Release*. As such, officers of Match Group, Inc. were necessarily responsible – with officers of IAC/INTERACTIVECORP – for

product planning, introduction and marketing decisions implementing all of these infringing products/services.

      30.      Further, Match Group, Inc., acting as the controlled agent of IAC/InterActiveCorp, controls the use of customer data across the Match, Tinder, and OkCupid infringing services, and Match Group, Inc.

> ***Match is part of the Match Group family of businesses which***, as of the date of this Privacy Policy, ***includes websites and apps such as Tinder, OkCupid***, Plenty of Fish, ***Match***, Meetic, BlackPeopleMeet, LoveScout24, OurTime, Pairs, ParPerfeito, and Twoo….
>
> ***We share your information with other Match Group companies*** to benefit you in two respects:
>
> > - ***for other Match Group companies to assist us in processing your information, as service providers, upon our instructions and on our behalf.*** Assistance provided by other Match Group companies may include technical processing operations, such as ***data hosting and maintenance, customer care, marketing*** and targeted advertising, finance and accounting assistance, better ***understanding how our service is used and users' behavior to improve our service***, securing our data and systems and fighting against spam, abuse, fraud, infringement and other wrongdoings.
> >
> > - In order to improve your chances at building significant connections with others, ***we may make you visible on other Match Group services or allow you to benefit from cross-platform functionalities***. We will of course comply with applicable law and, where relevant, notify you of any such opportunity and allow you to agree or to refuse. Examples of such opportunities may include the creation of a new service within Match Group, addressing a specific demographic that we feel would be interesting to you based on your search criteria.
>
> ***We may also share information with other Match Group companies for*** legitimate business purposes such as corporate audit, ***analysis*** and consolidated reporting as well as compliance with applicable laws. ***We may also share user information with other Match Group companies to remove users who violate our terms of service***, or have been reported for criminal activity and/or bad behavior. In some instances, ***we may remove that user from all platforms***.

*Match Privacy Policy*, available at https://www.match.com/dnws/LegalPolicy/PrivacyPolicy (emphasis added).

31.     On information and belief, Defendant Match Group, LLC is organized and existing under the laws of the State of Delaware.  However Match Group, Inc. represents that Match Group, LLC is a subsidiary of Match Group, Inc. *See Match Group 2017 Annual Report* at Ex. 21.1.  And IAC/INTERACTIVECORP represents that both Match Group, LLC and Match Group, Inc. are subsidiaries of IAC/INTERACTIVECORP.  *See IAC 2017 Annual Report* at Ex. 21.1.

32.     Match Group, LLC also purports to provide the Tinder and Match.com social media products/services to the public.  As noted above, both of these brands are proprietary brands of IAC/INTERACTIVECORP and are two of the controlled products/services which IAC/INTERACTIVECORP "provide[s] ... through websites and applications that we own and operate."  *See, e.g., IAC 2017 Annual Report* at p. 71.  Further, Match.com and Tinder are two of Match Group, Inc.'s "portfolio of trusted brands, [through which] we provide tailored products to meet the varying preferences of our users." *Match Group, Inc. 4Q 2017 Release*, p. 12.  As such, although Match Group, LLC is incorporated separately from both Match Group, Inc. and IAC/INTERACTIVECORP, Match Group, LLC is an agent of both IAC/INTERACTIVECORP and Match Group, Inc. and is directed and controlled by each of them, particularly with respect to the Tinder and Match.com social media products/services.  As used herein, "Match Group, LLC" includes any predecessor entities, including but not limited to Tinder, Inc.

33.        On information and belief, Match.com, a/k/a Match, is the brand for a social media dating product/service operated by Match Group, LLC, under the direction and control of Match Group, Inc. and IAC/INTERACTIVECORP.  Match Group, LLC's revenue associated with the Match.com product/service is also consolidated and reported as part of the operations of Match Group, Inc.

34.        On information and belief, Tinder is the brand for a social media dating Inc. product/service operated and controlled by Match Group, LLC, under the direction and control of Match Group, Inc. and IAC/INTERACTIVECORP.  Match Group, LLC's revenue associated with the Tinder product/service is also consolidated and reported as part of the operations of Match Group, Inc.

35.        On information and belief, OkCupid is the brand for a social media dating product/service controlled and directed by Match Group, Inc., which is in turn controlled and directed by IAC/INTERACTIVECORP.  IAC/INTERACTIVECORP and Match Group, Inc. control and direct OkCupid through a wholly-owned subsidiary, Humor Rainbow, Inc.  As noted above, OkCupid is a proprietary brand of IAC/INTERACTIVECORP and one of the services which IAC/INTERACTIVECORP "provide[s] ... through websites and applications that we own and operate." *See, e.g., IAC 2017 Annual Report* at p. 71.  Further, OkCupid is one of Match Group, Inc.'s "portfolio of trusted brands, [through which] we provide tailored products to meet the varying preferences of our users." *Match Group, Inc. 4Q 2017 Release*, p. 12.  As such, Humor Rainbow, Inc. is an agent of IAC/INTERACTIVECORP and Match Group, Inc. and is directed and controlled by these entities, particularly with respect to with respect to the OkCupid social media product/service. OkCupid's revenue is also consolidated and reported as part of the operations of Match Group, Inc.

36.         The Match Group, Inc. further holds out to the public that the CEO of OkCupid (Humor Rainbow, Inc.) and other such subsidiaries, including Tinder, Inc., are part of "our [leadership] Team."  http://mtch.com/leadership//.

37.         The Match Group, Inc. also directly hires and fires officers of its subsidiaries, including Humor Rainbow, Inc. and Tinder Inc. (now, on information and belief, Match Group, LLC), thus confirming that these subsidiaries are agents of the Match Group, Inc., and are directed and controlled by the Match Group, Inc. as well as by IAC/INTERACTIVECORP.   In June 2016, for example, the Match Group, announced that the "Match Group, … has hired Elie Seidman as Chief Executive Officer of OkCupid." https://www.prnewswire.com/news-releases/elie-seidman-joins-match-group-as-chief-executive-officer-of-OkCupid-300278811.html.

38.         Match Group, Inc. also shares officers and directors and shuffles officers throughout its subsidiaries.  For example, at least until recently, the Chairman and CEO of the Match Group, was also the CEO of Tinder, Inc. (now, on information and belief, Match Group, LLC) http://mtch.com/leadership//.  The Match Group, Inc. also recently moved Elie Seidman from his CEO position at OkCupid (Humor Rainbow, Inc.) to Tinder Inc. (now, on information and belief, Match Group, LLC) https://www.streetinsider.com/Corporate+News/Match+Group+%28MTCH%29+Names+Elie+Seidman+as+Tinders+new+CEO/13513868.html.  The persons responsible for overseeing Match Group, LLC, Humor Rainbow, Inc. and Tinder Inc. (now, on information and belief, merged into Match Group, LLC)  also report directly into the Match Group Inc.'s CEO, rather than reporting to their own companies' boards of directors.  *Id.*  In fact, Match Group, Inc.'s CEO, Sam Yagan,

https://www.bloomberg.com/research/stocks/people/person.asp?personId=31266963&privcapId=355279, made direct hiring and firing decisions regarding officers of Tinder Inc. (now Match Group LLC), including personally firing Tinder Inc.'s CEO.

https://www.forbes.com/sites/stevenbertoni/2014/11/04/exclusive-sean-rad-out-as-tinder-ceo-inside-the-crazy-saga/#4d8d08223ccd.

39.     As explained above, IAC/INTERACTIVECORP, both directly and through its controlled subsidiaries Match Group, Inc. and Match Group, LLC, control, direct, and operate all of the accused products/services as its own properties, such that the entities providing the accused products/services are in a controlled principal/agency relationship with IAC/INTERACTIVECORP.

40.     On information and belief, Vimeo is the brand for a social media video product/service operated by Vimeo, Inc., together with IAC/INTERACTIVECORP. On information and belief, Defendant Vimeo, Inc. is organized and existing under the laws of the State of Delaware. Although Vimeo, Inc. is incorporated separately from IAC/INTERACTIVECORP, Vimeo, Inc. is controlled, directed, and operates as a brand and subsidiary of IAC/INTERACTIVECORP. Vimeo, Inc.'s revenue is consolidated and reported as part of the operations of IAC/INTERACTIVECORP. As noted above, Vimeo, Inc. is an agent of IAC/INTERACTIVECORP, and is directed and controlled by it, particularly with respect to the Vimeo social media video product/service.

41.     Finally, none of the operations d/b/a Match.com, OkCupid, Tinder, and/or Vimeo provide any independent reporting of their revenue or profits and losses. Instead, the revenue and profits and losses associated with Match.com, OkCupid, Tinder, and Vimeo are

consolidated and reported as part of the operations of the Match Group, Inc. and/or IAC/INTERACTIVECORP.

42.          Accordingly, all of the accused infringing activities and products/services (i.e., Match.com, OkCupid, Tinder, and Vimeo) comprising infringing activities and the entities putatively responsible for those activities and products/services (Match Group, LLC and Humor Rainbow, Inc.) are directed and controlled by IAC/INTERACTIVECORP and Match Group, Inc., with the entities being operated as controlled agents of IAC/INTERACTIVECORP and Match Group, Inc. such that the dispute set forth in this Complaint should be entirely resolved in this case by this Court.

43.          This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.,* and the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

44.          This Court has personal jurisdiction over each of the Defendants because each is incorporated in the State of Delaware, offers infringing products in Delaware, and/or is an agent of IAC/INTERACTIVE and/or the Match Group Inc., which reside in Delaware.

45.          Venue is proper in this district under 28 U.S.C. § 1400(b) because each of the Defendants is incorporated in -- and therefore resides in -- the State of Delaware and/or is an agent of IAC/INTERACTIVE and/or the Match Group Inc., which reside in Delaware.

46.          The claims asserted herein against the IAC Defendants arise out of the same transactions, occurrences, or series of transactions, or occurrences relating to the making, using, selling, and offering for sale the same accused products/services or processes of the patented inventions without BT's license or permission.  As such, joinder of the IAC defendants is appropriate under 35 U.S.C. § 299(a)(1)-(2).

47.     Specifically, the assertions against IAC/INTERACTIVECORP in Counts II, IV and VI below with respect to the dating products/services are identical to those assertions against its agents, Match Group, Inc. and Match Group, LLC and involve the same product/services used, sold and offered for sale by these agents.  For example, as noted above, IAC/INTERACTIVECORP represents to the public and shareholders that all of the dating products/services at issue – Match.com, OkCupid, and Tinder, operated by IAC/INTERACTIVECORP's agents Match Group, Inc., Match Group, LLC, and Humor Rainbow, Inc. – comprise its own property which it controls.  http://iac.com/brands; IAC *2017 Annual Report*, p. 36; IAC *2016 Annual Report*, p. 2.  And, as also noted above, IAC/INTERACTIVECORP has admitted that "we operate" the accused products/services "[t]hrough Match Group [Inc.]"  (*IAC 2017 Annual Report* at p. 71) and that "we offer access to our [infringing] services via various mobile devices through our Match, OkCupid, Tinder and other branded mobile applications" (*IAC 2014 Annual Report*, p. 6).  IAC/INTERACTIVECORP performs these functions at least in part through controlling and directing its agents, Match Group, Inc. and Match Group LLC.

48.     The Match Group, Inc., similarly, and as also noted above, holds out to the public that it "operate[s]" the three social media dating products/services at issue – Match.com, OkCupid and Tinder – "to increase [Match Group, Inc.'s] users' likelihood of finding a meaningful connection"; the these products/services at issue are among the Match Group, Inc.'s "portfolio of brands;" and that through "our portfolio of trusted brands, [Match Group, Inc.] provide tailored products to meet the varying preferences of our users."  *Match Group, Inc. 4Q 2017 Release*, p. 12.  Match Group, Inc. "provide[s]" and "operate[s]" these infringing products/services at least in part through its agents, including Match Group, LLC.

49.         As noted above, officers of IAC/INERACTIVECORP and Match Group, Inc. were responsible for product planning, introduction and marketing decisions that resulted in the implementation of the same infringing products/services by their agents (including Match Group, Inc. and Match Group, LLC) in Match.com, OkCupid and Tinder.  As such, liability arises out of the same transactions and occurrences for these parties.   Further, this action will raise questions of fact common to all such defendants.   As such, based on the facts set forth in above, joinder of Match Group, Inc. and Match Group LLC with IAC/INTERACTIVECORP is appropriate with respect to at least Counts II, IV and VI below under 35 U.S.C. § 299(a)(1)-(2).

50.         Further, the assertions against IAC/INTERACTIVECORP with respect to the Vimeo service as set forth in Counts I, III and V are identical to those assertions against its controlled agent, Vimeo, Inc. and involve the same fact issues, legal issues, and products/services as used, sold and offered for sale by its controlled agent Vimeo, Inc.

51.         For example, as noted above, IAC/INTERACTIVECORP represents to the public and shareholders that the Vimeo products/services at issue in this litigation – operated by IAC/INTERACTIVECORP's agent Vimeo, Inc. – comprise its own property which it controls.  http://iac.com/brands; *IAC 2017 Annual Report*, p. 36; *IAC 2016 Annual Report*, p. 2. And, as also noted above, IAC /INTERACTIVECORP has admitted that "[w]e offer basic video hosting and sharing services free of charge" and provide a "customized viewing experience." *IAC 2017 Annual Report*, p. 8.  *See also IAC 2016 Annual Report*, pp. 6, 66.   As also noted above, IAC/INTERACTIVECORP acknowledges that it performs these accused functions through its agent, Vimeo.  "Through Vimeo, we offer video creators simple, professional grade tools to share, manage, distribute and monetize content online, and provide viewers with a clutter-free environment to watch content across a variety of Internet-enabled devices, including

mobile devices and connected television platforms." *IAC 2016 Annual Report*, p. 66. *See also IAC 2017 Annual Report*, p. 8. IAC/INTERACTIVECORP also represents to the public and shareholders that "[w]e market Vimeo's services primarily through online marketing efforts, including search engine marketing, social media, e-mail campaigns, display advertising and affiliate marketing, as well as through our owned and operated website and mobile applications." *IAC 2016 Annual Report*, p. 8. *See also IAC 2017 Annual Report*, p. 7.

52.        As noted above, officers of IAC/INERACTIVECORP were responsible for product planning, introduction and marketing decisions that resulted in the implementation by its agent, Vimeo, Inc. of the accused Vimeo products/services. As such, liability arises out of the same transactions and occurrences for these parties. Further, common questions of fact will arise as to IAC/INERACTIVECORP and Vimeo, Inc. in this litigation. As such, based on the facts set forth above, joinder of Vimeo, Inc. with IAC/INTERACTIVECORP is appropriate in this litigation as to counts I, III and V under 35 U.S.C. § 299(a)(1)-(2).

### Background

53.        BT is the oldest communications company in the world, tracing its origins back to the Electric Telegraph Company, which was incorporated in England in 1846. Today, more than 170 years after its founding, BT provides communications services in about 180 countries and employs more than 100,000 people worldwide.

54.        In addition to providing global communications and information services, BT's business also includes investing in research and development and creating new technologies that facilitate and improve the nature and delivery of communications and information services and the operation of communications networks and information services.

55.        From its earliest beginnings, BT has been at the forefront of research and innovation in communications technology, starting with BT's nineteenth century adoption of then-leading-edge telegraphy, including the world's first commercial telegraph service.

56.        In 1975, BT opened its renowned research facility at Adastral Park, near Ipswich in the county of Suffolk, England.  Adastral Park has housed some of world's leading technology researchers and engineers whose inventive efforts led to the issuance of more than 10,000 patents by the turn of the 20th century.  The innovations created at Adastral Park include the world's first instantaneous translation of speech by computer, advanced video-on-demand services, commercial optical fiber transmission, the world's fastest regenerator, and the world's first fully automated "spam buster" system to track down and block professional spammers.

57.        One of the areas in which BT has heavily invested over the last twenty years is managing the efficient and effective operation of communications networks and related computing infrastructure to support diverse information services, particularly in situations where different types of data for different types of information services are sent in a manner to accommodate the varying technical requirements of the different information services to users who access these different information services from varying locations via different network infrastructure under varying network operational conditions.

58.        BT's extensive work in this field has led to numerous BT patents, including the patents asserted in this litigation, which relate to inventions that can be used for the more efficient and effective delivery of information services, including technologies that enable information service providers to better manage and deliver information services to diverse subscriber bases.  BT is the owner of the patents asserted in this litigation.

**The Patents-In-Suit**

59.          On May 29, 2001, the United States Patent and Trademark Office duly and legally issued United States Letters Patent No. 6,240,450 ("the Sharples '450 patent"), entitled "Network Data Visualization System and Method for Downloading Visualization Software to a User Station After User Authentication."  BT is the assignee of the entire right, title, and interest in and to the Sharples '450 patent.  A true and correct copy of the Sharples '450 patent is attached as Exhibit A to this complaint.

60.          On May 28, 2002, the United States Patent and Trademark Office ("PTO") duly and legally issued United States Letters Patent No. 6,397,040 ("the Titmuss '040 patent"), entitled "Telecommunications Apparatus and Method."  BT is the assignee of the entire right, title, and interest in and to the Titmuss '040 patent.  A true and correct copy of the Titmuss '040 patent is attached as Exhibit B to this complaint.

61.          On June 10, 2003, the United States Patent and Trademark Office duly and legally issued United States Letters Patent No. 6,578,079 ("the Gittins '079 patent"), entitled "Communications Node For Providing Network Based Information Service."  BT is the assignee of the entire right, title, and interest in and to the Gittins '079 patent.  A true and correct copy of the Gittins '079 patent is attached as Exhibit C to this complaint.

62.          On July 10, 2007, the United States Patent and Trademark Office duly and legally issued United States Letters Patent No. 7,243,105 ("the Thint '105 patent"), entitled "Method and Apparatus for Automatic Updating of User Profiles."  BT is the assignee of the entire right, title, and interest in and to the Thint '105 patent.  A true and correct copy of the Thint '105 patent is attached as Exhibit D to this complaint.

63.         On July 5, 2011, the United States Patent and Trademark Office duly and legally issued United States Letters Patent No. 7,974,200 ("the Walker '200 patent"), entitled "Transmitting and Receiving Real-Time Data."  BT is the assignee of the entire right, title, and interest in and to the Walker '200 patent.  A true and correct copy of the Walker '200 patent is attached as Exhibit E to this complaint.

64.         On November 3, 2015, the United States Patent and Trademark Office duly and legally issued United States Letters Patent No. 9,177,297 ("the Thompson '297 patent"), entitled "Distributing Data Messages To Successive Different Subsets of Group Members Based on Distribution Rules Automatically Selected Using Feedback From a Prior Selected Subset."  BT is the assignee of the entire right, title, and interest in and to the Thompson '297 patent.  A true and correct copy of the Thompson '297 patent is attached as Exhibit F to this complaint.

65.          The Sharples '450, Titmuss '040, Gittins '079, Thint '105, Walker '200, and Thompson '297 patents are unrelated to each other, except insofar as they all relate to improvements in communications and information technology and are all part of BT's global patent portfolio.  These patents are collectively herein referenced as the Patents-in-Suit.

66.         The accused social media products/services offered, provided, sold, and used by IAC, its joint enterprises (e.g., Match.com, OkCupid, Tinder, Vimeo, and others), and their customers infringe the BT Patents-in Suit.

67.         IAC/INTERACTIVECORP and Match Group, Inc., together with their controlled agents, including Match Group, LLC and Vimeo, Inc., have (i) directly infringed the Patents-in-Suit when providing the accused products/services to customers and testing those products/services; (ii) directly controlled and directed others (including their controlled agents

defendants) to directly infringe the Patents-in-Suit when providing the accused products/services to customers and testing those products/services, (iii) provided to customers apps, applications, and/or applets that are directed and controlled by IAC and IAC's controlled agents, that have specific functionality that have no substantially noninfringing uses, and that are especially adapted to infringe, with instructions for uses in manners which infringe the Patents-in-Suit.

68.         BT has put IAC/INTERACTIVECORP and Match Group, Inc., together with their controlled agents, including Match Group, LLC and Vimeo, Inc., on notice of IAC's infringement of the BT Patents-in-Suit insofar as required by law.  IAC/INTERACTIVECORP and Match Group, Inc., together with their controlled agents, including Match Group, LLC and Vimeo, Inc., nevertheless have disregarded BT's notice, refused BT's efforts to reasonably resolve this dispute, and has continued infringing the BT Patents-in-Suit. IAC/INTERACTIVECORP and Match Group, Inc., together with their controlled agents, including Match Group, LLC and Vimeo, Inc., were aware of at least the Sharples '450 patent, the Titmuss '040 patent and the Thint '105 patent since at least September 7, 2015, when BT put IAC on notice of each of these patents in a letter from Peter Ratcliffe, Chief Counsel Intellectual Property Rights at BT to Mr. Joey Levin, Chief Executive Officer of IAC.  BT had subsequent communications with defendants' counsel, including a November 2015 meeting with counsel, a December 18, 2015, letter, a November 10, 2016, meeting among counsel and a December 15, 2016, letter.  Such communications included providing detailed presentations setting out exemplary infringement contentions.

69.         In addition, defendants were also aware of the Gittins '079 patent and the Walker '200 patent at least as early as December 15, 2016, when BT's counsel informed them that these patents were also of current interest and were infringed by IAC's Vimeo

26

products/services.   Furthermore, on information and belief, defendants were aware of the
Thompson '297 patent and its application to Tinder's Smart Photos product/service as well as of
at least that time, December 15, 2016, and certainly no later than the date of filing of this lawsuit.


## COUNT I
## Infringement of The Sharples '450 Patent

70.        BT re-alleges and incorporates paragraphs 1-69 above.

71.        The Sharples '450 patent is directed to an improved method of providing
data visualization to a remote user.

72.        The claimed invention of Sharples '450 is rooted in computer technology
to overcome problems specifically arising in the realm of networked computer systems and
provides improvements over prior art visualization systems.  For example, to improve upon prior
art visualization systems, Sharples '450 provides "a way to give remote access to data, together
with visualization capability, to non-technical users."   Sharples '450, 1:47-49.   In prior art
visualization systems, "data is generally stored locally to the computer on which the visualization
is to be performed and each set of data is approached with the user writing software to produce a
different visualization."  Sharples '450, 1:40-43.  But the invention in Sharples '450 "enable[s] a
non-technical user, at a remote location with respect to a database, to access a complex data set
and to control the manner of presentation so that the data is presented in a graphic and
understandable way," Sharples '450, 2:15-18, by "storing [a] data visualisation software tool in a
computer system" and "authenticating [a] request [for the tool] and outputting or copying the
tool to the user" in response to "receiving a request to the computer system from a remote user
for the tool," Sharples, '450, 9:60-67.  Accordingly, the invention of Sharples '450 is directed to
a specific implementation of a solution to a problem in the software arts, and it improves the

function and operation of the visualization system itself rather than performing some well-known function with a computer used in its ordinary capacity.

73.        Additionally, the particular arrangement of elements in the invention of Sharples '450 results in technical improvements over prior art systems.   Unlike prior art systems where "data is generally stored locally to the computer on which the visualization is to be performed and each set of data is approached with the user writing software to produce a different visualization," Sharples '450, 1:40-43, the invention of Sharples '450 "enable[s] a non-technical user, at a remote location with respect to a database, to access a complex data set and to control the manner of presentation so that the data is presented in a graphic and understandable way," Sharples '450, 2:15-18, by "storing [a] data visualisation software tool in a computer system" and "authenticating [a] request [for the tool] and outputting or copying the tool to the user" in response to "receiving a request to the computer system from a remote user for the tool," Sharples, '450, 9:60-67.  In operation, the invention of Sharples '450 provides technical benefits by "bring[ing] data visualisation techniques to a far greater range of users" and, "where large quantities of data are routinely collected on computerised monitoring systems," by (i) "[a]llowing a wider range of people within an organisation, with widely differing technical capabilities, to examine this data [and]…provide a valuable insight into the effectiveness of a particular operation" and/or (ii) "provid[ing] better information to…customers."  Sharples '450, 2:14-30.  Further, the invention of Sharples '450 includes both (i) inventive programming and (ii) an inventive distribution of functionality within a computing network.  For example, in some embodiments, the "data visualization software tool" comprises an applet "written in the Java programming language."  Sharples '450, 4:30-31.  And the claims of Sharples '450 cover an inventive distribution of functionality with a client-server computing network, including "storing

28

the data visualisation software tool in a computer system" remote from the user and "authenticating [a] request [for the tool] and outputting or copying the tool to the user" in response to "receiving a request to the computer system from [the] remote user for the tool." Sharples '450, 9:50-67.

74.        Without license or authorization, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have been and are directly and indirectly infringing, contributing to, and/or inducing infringement of the Sharples '450 patent by offering, selling, providing, and/or using Vimeo to provide charts, graphs, and statistics to Vimeo customers. IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., operate and control Vimeo throughout the United States and in Delaware in a manner that illegally uses the BT invention claimed in the Sharples '450 patent. For example, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have either themselves directly infringed the Sharples '450 patent in this manner, or directed and controlled their agents and/or third parties to infringe the Sharples '450 patent in this manner.  Further, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have continued to contribute to and/or actively induce the infringement of the Sharples '450 patent after receiving notice of its infringement by providing software to their controlled agents and/or third parties that has no substantial non-infringing use knowing the same to be especially adapted to infringe and to instruct such  controlled agents and/or third parties to provide Vimeo products/services in a manner that infringes the Sharples '450 patent.  An illustrative, non-limiting claim chart with further details regarding the infringement of the Sharples '450 patent by IAC/INTERACTIVECORP and its agent, Vimeo, Inc., is set forth in Exhibit G, which is incorporated by reference.   It should be noted that BT previously provided the claim chart in

Exhibit G to IAC on November 10, 2016, and the parties had several communications about the claim chart thereafter.

75.       More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have directly and indirectly infringed, actively induced the infringement of, and/or contributorily infringed the Sharples '450 patent by providing the Advanced Stats product/service of Vimeo to Vimeo customers.

76.       IAC's activities infringe BT's Sharples '450 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).  On information and belief, IAC has continued to infringe and to actively induce and/or contribute to the infringement of the Sharples '450 patent after receiving notice of its infringement.

77.       IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

78.       IAC's infringing activities have damaged BT and caused damage to BT's rights.  The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

79.       IAC's infringement of the Sharples '450 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

80.       It is apparent that IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc.,  will continue their infringing activities, damaging BT, unless and until enjoined by this Court.

## COUNT II
## Infringement of The Titmuss '040 Patent

81.     BT re-alleges and incorporates paragraphs 1-80 above.

82.     The Titmuss '040 patent is directed to an improved method of selecting information sources from which information is provided to users via a telecommunications system.  The claimed method generally involves receiving tracking information for a user and using it to track the user's location; accessing data for geographically-relevant information; and generating and transmitting to a terminal (such as a smartphone) a shortlist of information sources for said user on the basis of said tracking information and said location data so that the user can select and access more relevant information.

83.     The inventors of Titmuss '040 recognized the need for location-based services, which are now commonplace and highly relevant to users of smartphones. Titmuss '040 describes delivering a shortlist of relevant information sources to a user based on the user's location and, as such, goes to the heart of IAC's dating services, including Tinder, Match.com, and OkCupid. Without the improvements of Titmuss '040, (i) a user can be overwhelmed with information where the vast majority of it is irrelevant and/or out of context, and (ii) the network and backend servers would otherwise process and transmit higher volumes of unnecessary data to users' smartphones.  Also, a shortlist of relevant information sources results in less data for a user's smartphone to process and less data for the user's smartphone to display, which can be particularly advantageous in some embodiments where smartphones may have smaller screens.

84.     The claimed invention of Titmuss '040 is rooted in computer technology to overcome problems specifically arising in the realm of networked computer systems.  Titmuss '040 explains various shortcomings of prior art information systems.  For example, some prior art information systems could provide personalized information to a user at a fixed location.

31

Titmuss '040, 1:43-53.  Other prior art information systems were able to broadcast the same information to all users in a specific area.  Titmuss '040, 1:54-2:13.  Still other prior art information systems could transmit user-requested information to a user when the user was within predefined overlay areas along a predetermined travel route.  Titmuss '040, 2:14-26.

85.     To overcome the above-described and other shortcomings of prior art information systems, Titmuss '040 explains that "the invention provides a system in which information specific to the location of the user may be shortlisted, thereby filtering out information which relates to other locations," which "provides a basis for various improvements to known information distribution system[s]."  Titmuss '040, 3:3-7.  For example, the claimed invention in Titmuss '040 includes, in some embodiments, "tracking the location of a user in the system by receipt of tracking information for said user," "accessing location data indicating localities in which information from the respective sources is deemed to be relevant," "generating a shortlist of information sources for said user on the basis of said tracking information and said location data," and "transmitting said shortlist to a terminal associated with said user so as to allow said user to select an information source of interest and thereby to access information from said source."  Titmuss '040, 12:35-50.

86.     Additionally, the particular arrangement of elements in the claimed invention of Titmuss '040 results in technical improvements over prior art information systems and improves the functioning and operation of an information system itself.  For example, in contrast to prior art information systems, in some embodiments, "sets of information sources may be selected, and dynamically altered, for each user in the system, thereby providing for personalised information distribution which alters the information delivered dynamically in accordance with the location of each of the users."  Titmuss '040, 3:8-12.  Further, in some

embodiments, an "individual set of information sources may be further filtered with user-specific preference information pre-stored for each user."   Titmuss '040, 3:13-15.   As a result, one inventive concept of some embodiments of the claimed invention of Titmuss '040 lies at least in part in the combination and arrangement of the claimed functions, which in some embodiments enable "[d]ual filtering, both according to the location of the user and in accordance with pre-stored preference information, [which] can be used to provide particularly useful shortlists whereby the level of expected interest to a user of the information sources selected can be maintained at a high level, whilst nevertheless deriving information from a wide variety of sources."   Titmuss '040, 3:16-22.   As a result, users are not overwhelmed with irrelevant data and the network and backend servers avoid processing high volumes of unnecessary data.

87.     Without license or authorization, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have been and are directly infringing, contributing to and/or inducing infringement of the Titmuss '040 patent by offering, selling, providing and/or using the Match.com, OkCupid, and Tinder social media dating products/services to provide shortlists of information to its user customers. IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, operate and control the Match.com, OkCupid, and Tinder social media dating products/services throughout the United States and in Delaware in a manner that illegally uses the BT inventions claimed in the Titmuss '040 patent.

88.     More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have directly and indirectly infringed, actively induced the infringement of, and/or contributorily infringed the Titmuss '040 patent by providing products/services under the names

of "Mixer" for Match.com, "Quickmatch" and "Locals" for OkCupid, and as the basic functionality of Tinder.  For example, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have either themselves directly infringed the Titmuss '040 patent in this manner, or directed and controlled their agents and/or third parties to infringe the Titmuss '040 patent in this manner.  Further, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have continued to contribute to and/or actively induce the infringement of the Titmuss '040 patent after receiving notice of its infringement by providing software to their  controlled agents and/or third parties that has no substantial non-infringing use knowing the same to be especially adapted to infringe and to instruct such  controlled agents and/or third parties to provide Match.com, OkCupid, and Tinder social media dating products/services in a manner that infringes the Titmuss '040 patent. An illustrative, non-limiting claim chart with further details regarding the infringement of the Titmuss '040 patent by IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC., is set forth in Exhibit H, which is incorporated by reference.  It should be noted that BT previously provided the claim chart in Exhibit H to IAC on November 10, 2016, and the parties had several communications about the charts thereafter.

89.     IAC's activities infringe BT's Titmuss '040 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).  On information and belief, IAC has continued to infringe and to actively induce and/or contribute to the infringement of the Titmuss '040 patent after receiving notice of its infringement.

90.     IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

34

91.     IAC's infringing activities have damaged BT and caused damage to BT's rights.  The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

92.     IAC's infringement of the Titmuss '040 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

93.     It is apparent that IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, will continue their infringing activities, damaging BT, unless and until enjoined by this Court.

**COUNT III**
**Infringement of The Gittins '079 Patent**

94.     BT re-alleges and incorporates paragraphs 1-93 above.

95.     The inventor of the Gittins '079 patent recognized that the ability to authenticate users, represent authorized content (even from multiple sources) for user selection, and delivering content that the user has rights to access is highly valuable to companies that offer digital content.   The invention of Gittins '079 improves the efficiency of information systems and greatly enhances the usability of digital content management and delivery systems by providing systems and methods to manage digital content for users, content store providers, and content providers, including in house and 3rd party content providers.

96.     The claimed invention of Gittins '079 is rooted in computer technology to overcome problems specifically arising in the realm of networked computer systems.  Gittins '079 explains that, at the time of the invention, "[t]here [had] been a considerable increase in the number of documents that are in electronic form and are made available by various Information Service Providers, with or without charge, to the public via the World Wide Web," and "[w]here

an Information Service Provider charges for access to documents (herein referred to as information items, or just items), the manner of charging can vary from Provider to Provider, and also from document to document." Gittins '079, 1:14-24. Often, "[b]efore a person is granted access rights he has to execute an agreement with the Provider, under which he usually has to pay a periodic subscription fee (e.g. monthly, quarterly, or annual), and this may allow unlimited access to all the items retrievable from the Provider." Gittins '079, 1:24-29. But "[i]f unlimited access is not given, there may be a charge based on the number of items accessed (retrieved) by the person, or the charge may be on an item basis, with some documents carrying a higher charge than others depending upon the commercial worth accorded to the documents by the Provider." Gittins '079, 1:29-34. The above-described arrangement in prior art information systems gave rise to multiple problems. For example, "for each item that a person wishes to have access to, a separate access procedure (logon to the Provider) has to be performed." Gittins '079, 1:35-37. And "where the number of items is greater than just a few, the proliferation of separate agreements, separate bills, separate logon procedures and PINs can be burdensome for that person, especially if they have to be changed at intervals and these intervals are not synchronised between the various Providers." Gittins '079, 1:38-44.

97.      To overcome the above-described and other shortcomings of prior art information systems, Gittins '079 discloses embodiments that include (a) "storing customer identities, respective customer-associated lists of identities of information items, hereinafter referred to as items, for which the respective associated customer has access rights, and identities of item-associated information sources from which the respective items can be retrieved," (b) "receiving at the network a message requesting access to the information service and comprising at least a customer identity," (c) "reading the contents of the received message," and (d)

"retrieving from storage the list of information item identities associated with the received customer identity." Gittins '079, 14:55-67.  "[I]f no item identity is received in step b," then some embodiments include (e-1) "sending said list to the customer" and (e-2) "reading an item identity from a further message received from the customer."  Gittins '079, 15:1-4.  But "if an item identity is received in step b," then some embodiments include (f) "ascertaining whether or not that received item identity is in said list," and "for such item identity received in step b, if it is ascertained in step f that said received item identity is in said list, or, alternatively, for the item identity received in step e2," then some embodiments include (g) "ascertaining the identity of the information source associated with that received item identity," (h) "retrieving the requested item from that information source," and (i) "sending at least the first page of the retrieved item to the customer."  Gittins '079, 15:5-19.

98.        Additionally, the particular arrangement of elements in the claimed invention of Gittins '079 results in technical improvements over prior art information systems and improves upon the functioning and operation of an information system itself.  For example, in contrast to prior art information systems, in some embodiments, an information system operator using "the present invention can make a single agreement with a customer for the provision of all the customer's information service needs, whereby the customer has a single bill for all his accesses and makes a single payment."  Gittins '079, 2:59-64.  As a result, one inventive concept of the claimed invention of Gittins '079 lies at least in part in the combination and arrangement of claimed functions, which enables, among other features, (1) "sending said list to the customer" when "no item identity is received in step b," and (2) "if an item identity is received," then "ascertaining whether or not that received item identity is in said list," and "for such item identity received…, if it is ascertained…that said received item identity is in said

list…, ascertaining the identity of the information source associated with that received item identity," "retrieving the requested item from that information source," and "sending at least the first page of the retrieved item to the customer."   Gittins '079, 14:52-15:19.   These functions improve the functioning and operation of the information system by reducing how often the end user must enter login credentials to access content from multiple content sources via the information system, which in turn reduces the amount of data exchanged between the client and server and allows the information system to reduce the amount of computing resources that would have otherwise been allocated to processing multiple authentication transactions.

99.      Without license or authorization, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have been and are directly infringing, contributing to and/or inducing infringement of the Gittins '079 patent by offering, selling, providing, and/or using the Vimeo product/service to Vimeo users.   IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc.,  operate and control the Vimeo product/service throughout the United States and in Delaware in a manner that illegally uses the BT invention claimed in the Gittins '079 patent.

100.      More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have directly and indirectly infringed, actively induced the infringement of, and/or contributorily infringed the Gittins '079 patent by providing the basic video "purchased" or "rented" features of the Vimeo product/service.   An illustrative, non-limiting claim chart with further details regarding the infringement of the Gittins '079 patent by IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., is set forth in Exhibit I, which is incorporated by reference.

101.        IAC's activities infringe BT's Gittins '079 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).   On information and belief, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have continued to infringe and to actively induce, and/or contribute to the infringement of the Gittins '079 patent after receiving notice of its infringement. For example, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have either themselves directly infringed the Gittins '079 patent in this manner, or directed and controlled their agents and/or third parties to infringe the Gittins '079 patent in this manner.   Further, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have continued to contribute to and/or actively induce the infringement of the Gittins '079 patent after receiving notice of its infringement by providing software to their controlled agents and/or third parties that has no substantial non-infringing use knowing the same to be especially adapted to infringe, and instructing such  controlled agents and/or third parties to provide Vimeo products/services in a manner that infringes the Gittins '079 patent.

102.        IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

103.        IAC's infringing activities have damaged BT and caused damage to BT's rights.   The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

104.        IAC's infringement of the Gittins '079 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

105.        It is apparent that IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have will continue their infringing activities, damaging BT, unless and until enjoined by this Court.

## COUNT IV
## Infringement of The Thint '105 Patent

106.         BT re-alleges and incorporates paragraphs 1-105 above.

107.         The Thint '105 patent is directed to an improved method of updating a user profile based at least in part on rules, event statistics relating to a user's activity, and personalized rule weightings.  Some embodiments use an inference engine to infer and output an update to a user profile according to a set of stored rules that are then weighted according to personalized rule weightings which are, in turn, generated according to another set of rules and user preference data, using event statistics relating to a user's activity.  The architecture and combination of multiple rule sets provides a more efficient and better targeted result than was achieved by prior art systems.

108.         The claimed invention of Thint '105 is rooted in computer technology to overcome problems specifically arising in the realm of networked computer systems.  One shortcoming of "prior art arrangements [that] employ…fuzzy sets to represent certain user preferences and…employ pre-designed fuzzy rules to infer updates to a user's profile" is that such "prior art arrangements…offer little in the way of user control and personalisation of the profile update itself."  Thint '105, 2:19-24.

109.         To improve upon prior art systems, the claimed invention of Thint '105 includes, among other functionalities, "generating a set of personalized rule weightings according to a second set of rules and with reference to a set of user preference data" and "applying an inference engine to infer and output at least one update to a profile for the user according to said first set of rules weighted according to said generated set of personalized rule weightings, using…received event statistics."  Thint '105, 16:5-18.  In some embodiments, the "second set of rules" includes "integrated meta-rules that specify personalized rule weights

which in turn affect the strength of contribution of rules," which result in improvements over prior information systems.  Thint '105, 3:1-4.  In some embodiments, "rule weights 240 are used by [a] fuzzy inference engine 200 in a process of selective application of fuzzy rules 210, providing one degree of personalisation in a preferred profile inference process."  Thint '105, 5:20-24.  And in some embodiments, "user preferences 245 may be used in particular to personalize fuzzy sets 215 and as an input to the operation of meta rules 235 to personalize the rule weights 240 in respect of a particular user or group of users."  Thint '105, 5:31-34.  Further, in some embodiments, "certain user preference data may in practice be stored as part of a respective user's profile 220, for example as attributes or other data entities within the profile 220 itself, and hence be subject to adjustment through profile updates output by fuzzy inference engine 200."  Thint '105, 5:36-41.  Unlike prior art systems that "offer little in the way of user control and personalisation of the profile update itself," Thint '150, 2:19-25, the claimed invention of Thint '105 gives users more control and personalization of the user profile update itself via the recited combination of rules, preference data, rule weights, and event statistics.

110.     Additionally, the claims of Thint '105 specify how the recited elements (i.e., the first set of rules, second set of rules, user preference data, set of personalized rule weightings, and event statistics) are used together by an inference engine to infer and output an update to a user profile, which is not merely a routine or conventional computing application. Further, the particular arrangement of elements recited in the claimed invention of Thint '105 results in technical improvements over prior art systems and improves the functioning and operation of a computing system itself.  Unlike prior art systems that "offer little in the way of user control and personalisation of the profile update itself," Thint '150, 2:19-25, the claimed invention of Thint '105 includes, among other specific improvements, "generating a set of

personalized rule weightings according to a second set of rules and with reference to a set of user preference data," and "applying an inference engine to infer and output at least one update to a profile for the user according to said first set of rules weighted according to said generated set of personalized rule weightings, using said received event statistics."  Thint '105, 16:5-18. Thint '105 explains that in some embodiments, "[t]he personalisation program 665 operates with reference to meta-rules stored in a meta-rule store 670 to set and adjust personalized parameters (625), so determining the extent to which operation of the statistical computation program 645 and/or the fuzzy inference module 600 are personalized to a user's preferences…"  Thint '105, 9:8-13.  One inventive concept of Thint '105 lies at least in part in the combination and arrangement of functions in the claimed method, including how, at least in some embodiments, the inference engine uses inference algorithms with "rule weights 240…in a process of selective application of fuzzy rules 210, providing one degree of personalisation in a preferred profile update inference process," Thint '105, 5:20-24, which in turn enables the system of Thint '105 to update user profiles more quickly, efficiently, and effectively as compared to prior systems.

111.      Without license or authorization, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have been and are directly and indirectly infringing, contributing to, and/or inducing infringement of the Thint '105 patent by offering, selling, providing, and/or using the Match.com and OkCupid products/services to its users.  IAC operates and controls the Match.com and OkCupid products/services throughout the United States and in Delaware in a manner that illegally uses the BT invention claimed in the Thint '105 patent.

112.         More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have directly infringed, actively induced the infringement of, and/or contributorily infringed the Thint '105 patent by providing infringing products/services under the name of "Daily Matches" for Match.com and as the basic functionality (e.g., quiz question) of OkCupid. Illustrative, non-limiting claim charts with further details regarding the infringement of the Thint '105 patent by IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, are set forth in Exhibit J, which is incorporated by reference.  It should be noted that BT previously provided the example claim chart mapping claim 1 against the features of Match.com on November 10, 2016, and the parties had several communications about the chart thereafter.

113.         IAC's activities infringe BT's Thint '105 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).  On information and belief, IAC has continued to infringe and to actively induce and/or contribute to the infringement of the Thint '105 patent after receiving notice of its infringement.   For example, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have either themselves directly infringed the Thint '105 patent in this manner, or directed and controlled its  controlled agents  and/or third parties to infringe the Thint '105 patent in this manner.  Further, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have continued to contribute to and/or actively induce the infringement of the Thint '105 patent after receiving notice of its infringement by providing software to their controlled agents and/or third parties that has no substantial non-infringing use knowing the same to be especially adapted to infringe,

and instructing such controlled agents  and/or third parties to provide Match.com, OkCupid, and Tinder social media dating products/services in a manner that infringes the Thint '105 patent.

114.     IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

115.     IAC's infringing activities have damaged BT and caused damage to BT's rights.  The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

116.     IAC's infringement of the Thint '105 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

117.     It is apparent that IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, will continue their infringing activities, damaging BT, unless and until enjoined by this Court.


**COUNT V**
**Infringement of The Walker '200 Patent**

118.     BT re-alleges and incorporates paragraphs 1-117 above.

119.     The Walker '200 patent is directed to an improved method of streaming data from a server to a client.  The inventors of the Walker '200 patent recognized a need to improve the quality of streaming video delivered to a user and a need to improve a user's quality of experience with streaming video.

120.     In some embodiments, at least some of the streaming data is encoded with at least two different levels of transmission quality.  More generally, the claimed method involves interaction between a client and server, where the client displays data streamed from the server.  In operation, the server takes a first set of data packets encoded at a first encoding rate

44

and sends it to the client at a corresponding (but higher) transmission rate.  The client receives and reads the data at a corresponding rate and presents the data to a user at a first level of quality. The client subsequently indicates to the server when the client's store holding the data packets has reached a predetermined level (e.g., a level which suggests that the client can play out data at a higher rate/better quality). The server then takes a second set of data packets encoded at a second, faster encoding rate and transmits the second set of data packets to the client at a higher transmission rate.  The client reads the second set of data packets (e.g., at a data rate equal to the faster second-encoding-rate) for decoding and presents the data to the user at a second, higher level of quality.

121.    The claimed invention of Walker '200 is necessarily rooted in computer technology to overcome problems specifically arising in the realm of computer networks.  For example, Walker '200 explains, that "[t]ime-sensitive applications…require continuous, quality of service guaranteed, [and] high bandwidth data channels, which is seemingly at odds with the packet-based nature of the Internet and has the potential to disrupt transmissions with unacceptable packet jitter, i.e. the variation in the inter-arrival times of packets caused by variable routing and changeability of delivery rates owing to congestion."  Walker '200, 1:26-34. Further, "[c]urrently, commercial streaming technologies overcome jitter by constructing a large buffer (5-30 seconds) before starting to playback video material. This start-up delay is non-optimal for a user, who may have to wait for this period, before realizing that the content requested is incorrect; and generally detracts from the user's experience of the multimedia presentation."  Walker '200, 1:34-41.

122.        To improve upon prior art streaming systems, some embodiments of Walker '200 include, among other features, a "data sender" (or server) "transmit[ting] a first plurality of first-encoding-rate data packets encoded at a first encoding rate to said data presentation device, wherein said first plurality of first-encoding-rate data packets are transmitted at a first transmission rate which is higher than said first encoding rate of said first-encoding-rate data packets."  After the "data presentation device" (or client) "receive[s] said first plurality of first encoding rate data packets into said store," the data presentation device in some embodiments "read[s] out said received first-encoding-rate data packets from said store at a data rate equal to said first encoding rate of said first-encoding-rate data packets for decoding so as to present to a user at a first level of quality, wherein the removing of said first-encoding-rate data packets from said store is initiated when said first-encoding-rate data packets first arrive at said store."  And when "said store [is] filled with data packets to a predetermined level," the data presentation device in some embodiments "send[s] an indication to said data sender that said predetermined level has been reached."  "[O]n receipt of said indication from said data presentation device," the data sender in some embodiments "transmit[s] a second plurality of second-encoding-rate data packets encoded at a second encoding rate to said data presentation device, wherein said second plurality of second-encoding-rate data packets are transmitted at a second transmission rate which is higher than said first transmission rate" and "said second encoding rate is higher than said first encoding rate."  And after the data presentation device "receive[s] said second plurality of second-encoding-rate data packets into said store," the data presentation device in some embodiments "read[s] out said second-encoding-rate data packets from said store at a data rate equal to said second encoding rate of said second-encoding-rate data packets for decoding, so as to present to said user at a second level of quality, wherein said

46

second level of quality is higher than said first level of quality." Walker '200, 7:64-8:39. This combination of features improves upon prior art streaming systems by increasing network efficiency by transmitting data at a speed a user's network link can accommodate and improving the quality of the user's streaming experience by reducing start up delay.

123.        Further, the particular arrangement of the elements in the claimed invention of Walker '200 results in technical improvements over prior art information systems and improves the functioning and operation of a streaming system itself. For example, in some embodiments, the signaling between the data presentation device and the data sender "provides a method wherein the rate at which time-sensitive data is read out from first and second buffers may be dynamically varied in dependence upon the condition of a link to the client, and further, time-sensitive data encoded at a first bit-rate is read from a first data buffer at a first transmission rate to be transmitted to the client; or, time-sensitive data encoded at a second bit-rate is read from a second data buffer at a second rate, in dependence upon the condition of a link to the client, wherein said first bit-rate is lower than the second bit-rate," Walker '200, 3:15-24. This combination and arrangement of features increases network bandwidth efficiency at least in part by controlling the transmission of data from the server to the client based on data transmission rates that the communication link between the server and the client can support. Further, the combination and arrangement of features improves the quality of the user's streaming experience by sending lower bit-rate data first, which reduces start up delay, and sending higher bit-rate data later after determining that the transmission link can support higher data transmission rates, which enables the end user to enjoy higher quality video.

124.        Without license or authorization, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have been and are directly and indirectly infringing, contributing to, and/or inducing infringement of the Walker '200 patent by offering, selling, providing, and/or using the Vimeo and Vimeo Live products/services to Vimeo customers and/or users. IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., operate and control the Vimeo and Vimeo Live products/services throughout the United States and in Delaware in a manner that illegally uses the BT invention claimed in the Walker '200 patent.

125.        More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have directly infringed, actively induced the infringement of, and/or contributorily infringed the Walker '200 patent by the adaptive streaming product/service provided in at least the Vimeo and Vimeo Live products/services. Illustrative, non-limiting claim charts with further details regarding the infringement of the Walker '200 patent by IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., are set forth in Exhibit K, which is incorporated by reference.  It should be noted that BT previously provided the overview claim chart in Exhibit K to IAC on December 15, 2016, and the parties had several communications about the chart thereafter.

126.        IAC's activities infringe BT's Walker '200 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).  On information and belief, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have continued to infringe and to actively induce, and/or contribute to the infringement of the Walker '200 patent after receiving notice of its infringement.  For example, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have either themselves directly infringed the Walker '200 patent in this manner, or directed and controlled its agents and/or third parties to infringe the Walker '200 patent in this manner.

Further, on information and belief, IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., have continued to contribute to and/or actively induce the infringement of the Walker '200 patent after receiving notice of its infringement by providing software to their controlled agents and/or third parties, including providing smart phone apps, applications, and/or applets to customers, that have no substantial non-infringing use knowing the same to be especially adapted to infringe. Further, IAC has, on information and belief, continued to instruct such controlled agents and/or third parties, including customers, and/or to provide and/or use Vimeo products/services in a manner that infringes the Walker '200 patent.

127.     IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

128.     IAC's infringing activities have damaged BT and caused damage to BT's rights. The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

129.     IAC's infringement of the Walker '200 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

130.     It is apparent that IAC/INTERACTIVECORP and its controlled agent, Vimeo, Inc., will continue their infringing activities, damaging BT, unless and until enjoined by this Court.

## COUNT VI
## Infringement of The Thompson '297 Patent

131.     BT re-alleges and incorporates paragraphs 1-130 above.

132.     The Thompson '297 patent is directed to an improved method of distributing data messages to members of a user community over a data network. In general, the invention of the Thompson '297 patent includes, among other features, storing a plurality of

distribution rules, each of which comprises a set of instructions to determine subsets of members to whom a data message is to be transmitted, selecting and applying a first rule to send a message to a first subset of members, receiving feedback from that first subset of members, then automatically selecting a second distribution rule based on that feedback, and then using that rule to send a second data message to a second, different subset of members.

133.       The claimed invention of Thompson '297 is necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks.  For example, to improve upon prior art information systems, the claimed invention of Thompson '297 includes, among other features, "automatically select[ing] a second distribution rule from the plurality of distribution rules in dependence on the feedback data received [from one or more of the first subset of members] in respect of the first data message, the selected second rule being a rule which meets a predefined criterion or criteria based on the received feedback, the selected second rule being assigned for use in sending a second data message to a second, different, subset of members over said data network."   In some embodiments, the invention "enables automatic adaption and optimization of message distribution policies with a view to satisfying the changing requirements of members over time," Thompson '297, 2:22-24, by "propagat[ing] messages to different subsets of members in different stages, or rounds, while utilizing feedback from members of a particular subset to automatically determine membership of the next subset," Thompson '297, 3:27-31.

134.       Additionally, the particular arrangement of the elements in the claimed invention of Thompson '297 results in technical improvements over prior art information systems and improves the functioning and operation of an information system itself.   For example, in some embodiments, by "receiv[ing] feedback data in respect of the first data

message from one or more of the first subset of members" and then "automatically select[ing] a second distribution rule from the plurality of distribution rules in dependence on the feedback data received [from one or more of the first subset of members] in respect of the first data message, the selected second rule being a rule which meets a predefined criterion or criteria based on the received feedback, the selected second rule being assigned for use in sending a second data message to a second, different, subset of members over said data network," some embodiments of Thompson '297 improve upon prior art information systems to the extent that "messages need not be sent to a large number of people to get a quick response (potentially wasting processing resources, storage and bandwidth, not to mention annoying people having no interest in the message subject). Rather, we can choose to start with a relatively small subset and use the feedback from one or more of these members to propagate messages in a controlled and automated way to further subsets until terminating criteria are satisfied."  Thompson '297, 3:31-39.  This combination and arrangement of claimed features allows the information system of Thompson '297 to send more pertinent information to users without overwhelming the users with numerous messages, which reduces the volume of information that the information system needs to process and transmit to users, thereby providing more relevant information to users in a more computationally and network bandwidth efficient manner as compared to prior information systems.

135.           Tinder's Smart Photos product/service infringes the Thompson '297 patent.  Because getting matches on Tinder is focused on the first photograph shown to other users, Tinder has developed its Smart Photos product/service to identify which of a number of photos uploaded by a user receives the best response from other Tinder users.  In operation, the Smart Photos product/service initially alternates which of a user's photographs is shown as the

first photo to a first set of other Tinder users and then selects which photograph to present first to a subsequent set of Tinder users based on which photograph(s) were liked the most (e.g., selected as a possible date) by the first set of Tinder users.  According to Tinder's own testing, the Smart Photos product/service has increased matches between Tinder users by up to 12%. https://blog.gotinder.com/introducing-smart-photos-for-the-most-swipeworthy-you/.

136.        Without license or authorization, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have been and are directly and indirectly infringing, contributing to and/or inducing infringement of the Thompson '297 patent by offering, selling, providing, and/or using the Smart Photos product/service in connection with the Tinder product/service to Tinder users.   IAC/INTERACTIVE CORP operates and controls the Tinder product/service throughout the United States and in Delaware in a manner that illegally uses the BT invention claimed in the Thompson '297 patent.

137.        More particularly and by way of example but not limitation, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have directly infringed, actively induced the infringement of, and/or contributorily infringed the Thompson '297 patent by providing Tinder's Smart Photos product/service. An illustrative, non-limiting claim chart with further details regarding the infringement of the Thompson '297 patent by IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, is set forth in Exhibit L, which is incorporated by reference.

138.        IAC's activities infringe BT's Thompson '297 patent rights under 35 U.S.C. §§ 271 (a), (b), and (c).  On information and belief, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have continued to

infringe and to actively induce and/or contribute to the infringement of the Thompson '297 patent after receiving notice of its infringement.  For example, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have either themselves directly infringed the Thompson '297 patent in this manner, or directed and controlled their agents and/or third parties to infringe the Thompson '297 patent in this manner. Further, IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, have continued to contribute to and/or actively induce the infringement of the Thompson '297 patent after receiving notice of its infringement by providing software to their controlled agents and/or third parties that has no substantial non-infringing use knowing the same to be especially adapted to infringe and instructing such  controlled agents and/or third parties to provide Tinder social media dating products/services in a manner that infringes the Thompson '297 patent.

139.     IAC's conduct not only usurps BT's technology but also undermines BT's reputation and goodwill, such that BT has no adequate remedy at law.

140.     IAC's infringing activities have damaged BT and caused damage to BT's rights.  The extent of damage suffered by BT and caused by IAC is not yet known, but the damage is substantial and will be determined in the course of litigation.

141.     IAC's infringement of the Thompson '297 patent has been knowing, deliberate, willful, and in reckless disregard of BT's rights.

142.     It is apparent that IAC/INTERACTIVECORP and Match Group, Inc. and their controlled agents, including Match Group, LLC, will continue their infringing activities, damaging BT, unless and until enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, BT respectfully demands the following relief for itself and against the IAC Defendants:

(a) This Court find and enter judgment that IAC/INTERACTIVECORP, Match Group, Inc., and their controlled agents, including Match Group, LLC and Vimeo, Inc. have directly and indirectly infringed each of the Patents-in-Suit under 35 U.S.C. §§ 271(a), (b), and (c);

(b) This Court issue preliminary and permanent injunctions enjoining IAC/INTERACTIVECORP, Match Group, Inc., and their controlled agents, including Match Group, LLC and Vimeo, Inc. and their officers, agents, servants and employees, privies, and all persons in active concert or participation with them from further infringing each of the Patents-in-Suit;

(c) This Court ascertain and award BT damages sufficient to compensate for IAC's infringement of each of the Patents-in-Suit;

(d) This Court find that the infringement by IAC/INTERACTIVECORP, Match Group, Inc., and their controlled agents, including Match Group, LLC and Vimeo, Inc. was willful, and that the damages so ascertained be trebled and awarded to BT with interest;

(e) This Court find this case to be exceptional and award BT its attorney's fees, costs, and expenses in this action; and

(f)  This Court grants such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff BT demands a trial by jury on all issues so triable.


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Daniel A. Boehnen
Grantland G. Drutchas
Jeffrey P. Armstrong
MCDONNELL BOEHNEN
HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, IL 60606
(312) 913-0001

By: */s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

Dated:  June 8, 2018
5836903

*Attorneys for Plaintiff*
*British Telecommunications plc*