# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRITISH TELECOMMUNICATIONS PLC, §
§
    *Plaintiff*, §
§
v. §
§     Civil Action No. 18-366-WCB
§
IAC/INTERACTIVECORP, MATCH §
GROUP, INC., MATCH GROUP, LLC, and §
VIMEO, INC., §
§
    *Defendants*. §

## MEMORANDUM OPINION & ORDER

### BACKGROUND

Plaintiff British Telecommunications plc ("British Telecom") filed its first amended complaint in this action on June 8, 2018, against IAC/InterActiveCorp ("IAC"), Match Group, Inc. ("MGI"), Match Group, LLC ("MGL"), and Vimeo, Inc. ("Vimeo"). The first amended complaint alleged that the named defendants infringed six patents owned by British Telecom: U.S. Patent Nos. 6,240,450 ("the '450 patent"), 6,397,040 ("the '040 patent"), 6,578,079 ("the '079 patent"), 7,243,105 ("the '105 patent"), 7,974,200 ("the '200 patent"), and 9,177,297 ("the '297 patent"). Dkt. No. 17, at 24–25. British Telecom accused IAC and Vimeo of infringing the '450 patent, the '079 patent, and the '200 patent. *Id.* at 29, 38, 48. It accused IAC, MGI, and MGL of infringing the '040 patent, the '105 patent, and the '297 patent. *Id.* at 33, 42, 52.[1]

---

[1] Vimeo and MGL both interpreted the first amended complaint as accusing each of the defendants of infringing all six patents. British Telecom clarified that "Counts II [the '040 patent], IV [the '105 patent], and VI [the '297 patent] do not allege infringement by Vimeo" and that "Counts I [the '450 patent], III [the '079 patent], and V [the '200 patent] do not allege infringement by MGL." Dkt. No. 28, at 1; Dkt. No. 32, at 1. Therefore, Vimeo's motion to dismiss with respect

Vimeo filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss British Telecom's first amended complaint. Dkt. No. 22. In that motion, Vimeo argues that British Telecom "has not pleaded facts demonstrating that Vimeo has infringed [the '200 patent], as [British Telecom] has failed to allege that Vimeo's video service reads on a critical claim element." Dkt. 23, at 1. Vimeo also seeks dismissal of the claims predicated on the '450 patent and the '079 patent on the ground that those patents are directed to patent-ineligible subject matter. *Id.*

MGL also filed a motion under Rule 12(b)(6) to dismiss British Telecom's first amended complaint. Dkt. No. 24. MGL argues that British Telecom "has not pleaded facts that make infringement plausible" under the '105 patent. Dkt. No. 25, at 1. MGL also argues that the '040 patent and the '297 patent are directed to patent-ineligible subject matter. *Id.*

## DISCUSSION

### I. The '105 patent and the '200 patent

Vimeo and MGL have filed motions to dismiss the claims of the amended complaint directed to the '105 and '200 patents, respectively. They argue that the complaint fails to allege facts sufficient to satisfy the pleading requirements set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and the line of cases following *Twombly* and *Iqbal*.

---

to the '040 patent, the '105 patent, and the '297 patent, and MGL's motion to dismiss with respect to the '450 patent, the '079 patent, and the '200 patent, are denied as moot.

British Telecom has yet to identify the particular patent claims it intends to assert against the defendants. However, the infringement chart attached to the amended complaint identifies certain claims as illustrative of the defendants' alleged infringement. *See* Dkt. No. 17-1, Exhs. G-L. The Court focuses on those claims in this order.

In considering whether a complaint should be dismissed for failure to state a claim upon which relief can be granted, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). Nonetheless, as the Supreme Court has made clear, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Importantly, it is not necessary for the plaintiff to plead "specific facts." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *see Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). As this court has explained:

> So long as plaintiffs do not use "boilerplate and conclusory allegations" and "accompany their legal theory with factual allegations that make their theoretically viable claim plausible," the Third Circuit has held "pleading upon information and belief [to be] permissible [w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control."

*DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 468 (D. Del. 2016) (quoting *McDermott v. Clondalkin Grp., Inc.*, 649 Fed. Appx. 263, 267–68 (3d Cir. 2016). And in the context of patent litigation, "it is logical to presume that a defendant has greater access to, and therefore, more information [than the plaintiff] about its accused method." *DermaFocus*, 201 F. Supp. at 469.

## A. The '105 Patent

The '105 patent is entitled "Method and Apparatus for Automatic Updating of User Profiles." The patent is directed to "a method and apparatus for updating user profiles based upon personalized reasoning about user activity." '105 patent, col. 1, ll. 9-11. The invention employs an inference engine that infers and outputs updates to a user profile according to a first set of rules and event statistics. *Id.* at col. 4, ll. 35-60. The first set of rules is weighted according to a set of personalized rule weightings, which are generated according to a second set of rules and user preference data. *Id.* at col. 5, ll. 8-34. According to the inventor, this two-rule method for updating user profiles was an improvement over prior art systems, which updated user profiles, but "offer[ed] little in the way of user control and personalization of the profile update process itself." *Id.* at col. 2, ll. 23-24. Illustrative claim 10 is a method claim, which provides as follows:

> A method of updating a user profile, the user profile being suitable for use in providing customized services to a respective user, the method comprising:
> (i) storing a first set of rules;
> (ii) generating a set of personalized rule weightings according to a second set of rules and with reference to a set of user preference data;
> (iii) receiving event statistics relating to a user's activity; and
> (iv) applying an inference engine to infer and output at least one update to a profile for the user according to said first set of rules weighted according to said generated set of personalized rule weightings, using said received event statistics.

The first amended complaint states that MGL, together with IAC and MGI, "directly infringed, actively induced the infringement of, and/or contributorily infringed the . . . '105 patent by providing infringing products/services under the name of 'Daily Matches' for Match.com," an on-line dating service. Dkt. No. 17, at 43; *see* Dkt. No. 32, at 8. Accompanying the first amended complaint is an infringement chart that includes factual allegations discussing how "Daily Matches" practices each element of claim 10 of the '105 patent. Dkt. No. 17, Ex. J; *see DermaFocus*, 201 F. Supp. at 469.

The first amended complaint and accompanying infringement chart present a plausible theory of infringement. British Telecom specifically describes how MGL's product meets each limitation in claim 10, using photographs of the product and quoting language from Match.com's website. *See Disc Disease*, 888 F.3d at 1260 (finding Plaintiff's complaint sufficient because it "specifically identified the three accused products—by name and by attaching photos of the product packaging as exhibits—and alleged that the accused products meet 'each and every element of at least one claim.'"). For example, the infringement charts allege that: "[a] first set of rules is based on information in the user's profile"; "Match.com generates personalized weightings for the users according to a second set of rules and with reference to a set of user preference data"; "Match.com receives event statistics relating to the user's activity when the user rates other users"; and "Match.com updates the criteria it uses for matching a particular user (in the user's profile) with other users based on the [user's preference and activity]." Dkt. No. 17, Ex. J. These allegations are sufficient to satisfy the pleading requirements set forth in the *Twombly/Iqbal* line of cases.

MGL argues that the first amended complaint "contains nothing showing that two sets of rules are present in the accused Match.com service . . . [and] merely shows that the Match.com service utilizes an algorithm that learns user preferences from user ratings of proposed matches." Dkt. No. 25, at 7. However, MGL's argument is based on a more rigorous pleading standard than the law imposes. That is especially clear in light of the fact that, as appears to be the case here, MGL's "Daily Match" algorithm is not in the public domain. MGL fails to demonstrate how British Telecom could have determined whether, for example, MGL's product contains "IF/THEN" rule statements that "are the hallmarks of the '105 Patent." *Id.* at 8; *see* Dkt. No. 34,

at 3 (British Telecom's claim charts "provide no basis to infer that the Match.com service employs any of the '105 Patent's hallmark claim elements: multiple rule sets . . . .").

MGL also argues that "British Telecom equates the claims' rules with Match.com's preference data." Dkt. No. 25, at 9. According to MGL, that is inappropriate, because "as a matter of plain English and common sense, user 'preferences' are not 'rules.'" That argument misconstrues British Telecom's infringement contentions. The infringement contentions clearly differentiate between rules and preferences. *See* Dkt. No. 17, Ex. J, at 17 ("first set of rules is *based on* . . . user preferences" (emphasis added)); *id.* at 18 ("Match.com generates personalized weightings for the users according to *a second set of rules* and with reference to *a set of user preference data*" (emphasis added)).

Implicit in MGL's argument regarding rules and preferences is a second argument—that in order to fall within the claims of the '105 patent, rules cannot be based on or set by user preferences. *See* Dkt. No. 25, at 9. However, that argument is directed to an issue of claim construction that is not suitable for resolution at the motion-to-dismiss stage of this case. Therefore, MGL's motion to dismiss with respect to the '105 patent, is denied.

**B. The '200 Patent**

The '200 patent is entitled "Transmitting and Receiving Real-Time Data." The patent is directed to "a method of providing a streaming video service to a [video viewer] across [the Internet] whilst reducing the start-up delay usually associated with preparing a buffer of data." *See* '200 patent, col. 1, ll. 14-17. At the time of the invention, commercial streaming technologies constructed "a large buffer (5-30 seconds) before starting to playback video material." *Id.* at col. 1, ll. 36-38. To reduce start-up delays, the patent contemplates first transmitting lower quality data from a video streamer to a video viewer. *See id.* at col. 2, ll. 31-37; *id.* at col. 5, ll. 11-15. The

lower quality data can be transmitted at a faster rate than the video viewer consumes the data, such that the excess data builds a buffer at the video viewer while permitting immediate data consumption. *See id.* at col. 5, ll. 19-26. When the build-up of excess data reaches a predetermined level at the buffer, a command is sent to the video streamer, which switches the transmission of data from low quality data to high quality data. *Id.* at col. 5, ll. 27-42. In addition to reducing start-up delays, the buffer enables user-friendly video streaming despite variations in network conditions, "which might otherwise have a detrimental effect on the overall perceived quality of the media." *Id.* at col. 4, ll. 58-62; col. 6, ll. 15-17. Illustrative claim 4 is a method claim, which provides as follows:

> A method of operating a communication apparatus comprising a data sender, a data presentation device having a store, and a network connecting said data sender and said data presentation device, said method comprising:
>> operating said data sender to transmit a first plurality of first-encoding-rate data packets encoded at a first encoding rate to said data presentation device, wherein said first plurality of first-encoding-rate data packets are transmitted at a first transmission rate which is higher than said first encoding rate of said first-encoding-rate data packets;
>> operating said data presentation device to:
>> receive said first plurality of first encoding rate data packets into said store;
>> read out said received first-encoding-rate data packets from said store at a data rate equal to said first encoding rate of said first-encoding-rate data packets for decoding so as to present to a user at a first level of quality, wherein the removing of said first-encoding-rate data packets from said store is initiated when said first-encoding-rate data packets first arrive at said store;
>> on said store being filled with data packets to a predetermined level, sending an indication to said data sender that said predetermined level has been reached;
>> operating said data sender, on receipt of said indication from said data presentation device, to transmit a second plurality of second-encoding-rate data packets encoded at a second encoding rate to said data presentation device, wherein said second plurality of second-encoding-rate data packets are transmitted at a second transmission rate which is higher than said first transmission rate; and wherein said second encoding rate is higher than said first encoding rate;
>> operating said data presentation device to:

receive said second plurality of second-encoding-rate data packets into said store;

read out said second-encoding-rate data packets from said store at a data rate equal to said second encoding rate of said second-encoding-rate data packets for decoding, so as to present to said user at a second level of quality, wherein said second level of quality is higher than said first level of quality.

The first amended complaint alleges that IAC and Vimeo have "directly infringed, actively induced the infringement of, and/or contributorily infringed the [] '200 patent by the adaptive streaming product/service provided in at least the Vimeo and Vimeo Live products/services." Dkt. No. 17, at 48. The infringement chart accompanying the first amended complaint includes factual allegations discussing how Vimeo's adaptive streaming product/service practices every element of claim 4 of the '200 patent. Dkt. No. 17, Ex. K.

Vimeo argues that, according to British Telecom's own infringement chart, not all of the elements of claim 4 are met by Vimeo's system, and that the complaint therefore does not plausibly allege infringement. *See* Dkt. No. 23, at 7; Dkt. No. 30, at 4. In particular, Vimeo focuses on the following claim element: "on said store being filled with data packets to a predetermined level, sending an indication to said data sender that said predetermined level has been reached." '200 patent, claim 4. Vimeo states that the industry standard protocol by which its streaming system operates does not "send an indication" to a data sender that a predetermined buffer level at the client device (i.e., said predetermined level) has been reached. Dkt. No. 23, at 7. Rather, once the buffer at the client device is filled to a predetermined level, the client device makes a "GET request." *Id.* at 8. The "GET request" selects the next segment of data from the data sender to be downloaded to the client device. *Id.* According to Vimeo, this selection process excludes sending any type of buffer level indication to the data sender. *See id.* at 7 ("[C]lient devices select among different coded representations of video, called 'segments,' without transmitting any such

indication."); *id.* at 7–8 ("This is a selection operation, not a transmission operation" (emphasis in original)); *id.* at 8 ("These GET requests are identical to each other in form and function").

British Telecom argues that the infringement chart shows that a "GET request" based on buffer level is equivalent to "an indication." Dkt. No. 28, at 9. It characterizes Vimeo's arguments as "fact issues and claim construction issues." *Id.* According to British Telecom, these issues include: "(i) the construction of the term 'an indication,' (ii) whether a 'GET request' is 'an indication' as properly construed, and (iii) the factual circumstances under which a presentation device transmits a 'GET request' for a high-quality video stream." *Id.*

In its reply brief, Vimeo argues that "GET requests" cannot be "indications" because "Vimeo's servers [do not] respond to a GET request as required by the claims by providing a video stream at a higher quality." Dkt. No. 30, at 3. Instead, according to Vimeo, "a Vimeo server responds to a GET request only by providing the requested segment." *Id.*

Reading the first amended complaint and the attached infringement chart in the light most favorable to the plaintiff, the Court finds it plausible that a "GET request" meets the "indication" limitation, and that granting a motion to dismiss based on the defendant's argument regarding that limitation would be improper. It is unclear why, at least at the current stage of the case, a "GET request" does not (at least implicitly) indicate to the data sender, when the sender selects a data segment, that a predetermined buffer level has been reached. It is also unclear how Vimeo's argument in its reply brief regarding video stream quality justifies dismissal. Vimeo fails to articulate how "Vimeo's servers [do not] respond to a GET request as required by the claims by providing a video stream at a higher quality" if a "GET request" selects a data segment that provides a video stream at a higher quality than the previous segment. Vimeo's motion to dismiss, with respect to the '200 patent, is therefore denied.

## II.  The '297 patent, the '040 patent, the '450 patent, and the '079 patent

### A.  The *Alice* Two-Step Test

The framework for analyzing the issue of patentable subject matter under 35 U.S.C. § 101 is well settled.  The Supreme Court's decision in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), established a two-step test for determining whether a patent is directed to an unpatentable idea.  First, the court must determine "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea.  573 U.S. at 218.  Second, if the claims are directed to an abstract idea, the court must decide whether there is an "inventive concept" in the claims at issue.  The Supreme Court characterized an "inventive concept" as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself'"; the presence of an "inventive concept," the Court explained, is enough to "'transform the nature of the claim' into a patent-eligible application."  *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.* 566 U.S. 66, 72–73, 78 (2012)).

The first step of the two-step *Alice* analysis requires the court to examine the "focus" of the claim, i.e., its "character as a whole," in order to determine whether the claim is directed to an abstract idea.  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  The second step, if reached, requires the court to "look[] more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, the claims identify an "'inventive concept'" in the application of the ineligible matter to which (by assumption at step two) the claim is directed."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted).

### 1. Step 1: Abstract Idea

Defining an "abstract idea," as that term is used in section 101 jurisprudence, has not proved to be a simple task. Neither the Supreme Court nor the Federal Circuit has ventured a single, comprehensive definition. *See Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case."); *Bilski v. Kappos*, 561 U.S. 593, 621 (2010) (Stevens, J., concurring in the judgment) ("The Court . . . never provides a satisfying account of what constitutes an abstract idea."); *Elec. Power Grp.*, 830 F.3d at 1353 ("We need not define the outer limits of 'abstract idea'"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) ("The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry. . . . Rather, both this court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."). Rather than a unitary test, what has emerged from the section 101 cases is a group of related principles that can be applied in gauging whether or not a patent claim is directed to an abstract idea. They include the following:

First, the courts have characterized "method[s] of organizing human activity" as abstract. *See Alice*, 573 U.S. at 220; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018). In particular, the courts have identified fundamental economic practices that have long been prevalent in our system of commerce as abstract ideas. Applying that principle in the field of computers and telecommunications, the courts have held that claims directed to simply implementing such economic practices on a computer are not patent-eligible. *See Alice*, 573 U.S. at 217–21; *Bilski*, 561 U.S. at 611; *BSG*, 899 F.3d at 1285 ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one" of

*Alice*.).  Nor does the fact that a computer can perform such operations more rapidly and efficiently make an abstract idea any less abstract or any more patent-eligible.  *See, e.g., RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

Second, as applied to computer applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform "economic or other tasks for which a computer is used in its ordinary capacity."  *Enfish,* 822 F.3d at 1336.  Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible.  *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) (methods for making electronic spreadsheets more accessible); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361–63 (Fed. Cir. 2018) (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) (improved computer memory system).

Numerous Federal Circuit decisions have drawn the distinction between patent-eligible claims that "are directed to a specific improvement in the capabilities of computing devices," as opposed to "'a process that qualifies as an "abstract idea" for which computers are invoked merely

as a tool.'" *Core Wireless*, 880 F.3d at 1361–62 (quoting *Enfish*, 822 F.3d at 1336); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014). In the computer field, this principle has sometimes been described as requiring "a technological solution to a technological problem specific to computer networks." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("the claims are not directed to a solution to a 'technological problem'").

Third, in determining whether a particular claim is directed to an abstract idea, courts have focused on whether the claim is purely functional in nature rather than containing the specificity necessary to recite how the claimed function is achieved. The Federal Circuit has focused on the problem of functional claiming in a number of recent section 101 decisions. In those cases, the Federal Circuit, treating the term "abstract" as an antonym of "concrete" or "specific," has analyzed whether the claims before it are sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result. For example, in *SAP America*, 898 F.3d at 1167, the court asked whether the claim had "the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it." To answer that question, the Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *McRO*, 837 F.3d at 1314 ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic

processes and machinery.").  Thus, the question in such cases is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp*, 855 F.3d at 1326.

As Judge Chen noted for the Federal Circuit in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018), the focus on functionality as a measure of patent eligibility has a long and notable pedigree.  Judge Chen cited *Wyeth v. Stone*, 30 F. Cas. 723 (C.C.D. Mass. 1840), as an example of an early expression of some of the policy concerns that underlie the issue of patent eligibility. In that case, Justice Story, riding circuit, presided over a patent infringement suit involving two claims.  In one, the patentee claimed a particular apparatus and machinery to cut ice, and in the other the patentee claimed "an exclusive title to the art of cutting ice by means of any power, other than human power." *Id.* at 727.  Justice Story ruled that the second claim was "utterly unmaintainable," because it was "a claim for an art or principle in the abstract, and not for any particular method or machinery, by which ice is to be cut." *Id.*

In *Interval Licensing*, the Federal Circuit also pointed to the Supreme Court's nineteenth century decisions in *O'Reilly v. Morse*, 56 U.S. (15 How.) 62 (1853), and *Le Roy v. Tatham*, 55 U.S. (14 How.) 156 (1853), which make similar observations.  *See Interval Licensing*, 896 F.3d at 1343; *see also Mayo*, 566 U.S. at 70.  Importantly, in both of those older cases the Court emphasized that a claim to a result, however achieved, is not patentable, and that allowing such a patent would have impermissible preemptive effects.  That assessment anticipated the analysis in the Court's more recent section 101 cases, in which the Court has pointed to concerns about preemption as an important factor driving the Court's restrictions on claims directed to abstract ideas.  *Compare Le Roy*, 55 U.S. (14 How.) at 175 ("A principle, in the abstract, . . . cannot be patented. . . .  A patent is not good for an effect, or the result of a certain process, as that would

prohibit all other persons from making the same thing by any means whatsoever."), *with Alice*, 573 U.S. at 216 (quoting *Mayo*, 566 U.S. at 85 ("We have described the concern that drives this exclusionary principle as one of pre-emption. . . . We have 'repeatedly emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity.")).

Based on that analysis and other Federal Circuit decisions to the same effect, the Federal Circuit in *Interval Licensing* held the representative claim before it, which was directed to what was called an "attention manager" in a computer readable medium, to be patent-ineligible. That was so, the court explained, because the claim recited a "broad, result-oriented" structure, and because "[i]nstead of claiming a solution for producing [a] result, the claim in effect encompasses all solutions." 896 F.3d at 1345.

Other cases from the Federal Circuit have employed the same analysis and applied it to hold claims ineligible under section 101. *See Two-Way Media,* 874 F.3d at 1337 ("The claim [before the court] requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way."); *Clarilogic, Inc. v. Formfree Holdings Corp.*, 681 F. App'x 950, 954 (Fed. Cir. 2017) ("[A] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction."); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("IV argues that the claims set forth a unique solution to a problem with contemporary XML documents. . . . But the claims do not recite particular features to yield these advantages. Although the claims purport to modify the underlying XML document in response to modifications made in the dynamic document, this merely reiterates the patent's stated goal

itself. . . . Indeed, the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it.  Our law demands more."); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) ("The patents claim systems including menus with particular features.  They do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("While independent claim 1 refers to general components such as a cellular telephone, a graphical user interface, and a downloadable application, the claimed invention is entirely functional in nature.  It recites software in the form of 'an application configured for execution by the wireless cellular telephone device' that performs three functions . . . .  There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone.  Rather, the claim is drawn to the idea itself."); *McRO,* 837 F.3d at 1314 ("The abstract idea exception has been applied to prevent patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished.'"); *Elec. Power Grp.*, 830 F.3d at 1356 (referring to the "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them" and quoting with approval the district court's observation that "'there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general.'"); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 615 ("vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention")' *Internet Patents*, 790 F.3d at 1348 ("[C]laim 1 contains no restriction on how the result is accomplished.  The mechanism for maintaining the state is not described, although this is stated to be the essential innovation.").

## 2. Step Two: Inventive Concept

The "inventive concept" step requires the court to determine whether the claims recite an element or combination of elements that is sufficient to ensure that the patent claims "significantly more" than the ineligible concept itself. *Alice*, 573 U.S. at 218; *Mayo*, 566 U.S. at 72–73. As the Supreme Court explained in *Alice*, the court at the second step of the inquiry looks to see whether there are any "additional features" that constitute an inventive concept that would render the claims eligible for patenting even if they were determined to be directed to an abstract idea. *Alice*, 573 U.S. at 221; *see also Erie Indemnity Co.*, 850 F.3d at 1328. The *Alice* Court explained that no such "inventive concept" would be found if the "additional features" were merely "well-understood, routine, conventional activities." *Alice*, 573 U.S. at 225 (quoting *Mayo*, 566 U.S. at 73).

The Federal Circuit's decision in *Electric Power Group* is highly instructive with regard to what is considered well-understood, routine, or conventional. The court in that case first determined that the claims before it were directed to an abstract idea. Upon scrutinizing the claim elements "more microscopically," the court then found "nothing sufficient to remove the claims from the class of subject matter ineligible for patenting." 830 F.3d at 1354. The court pointed out that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id.* at 1355. The *Electric Power Group* court added that the claims there at issue "do not require an arguably inventive set of components or methods, such as measurement devices or techniques." *Id.* The court added:

> Inquiry therefore must turn to any requirements for *how* the desired result is achieved. But in this case the claims' invocation of computers, networks, and

displays does not transform the claimed subject matter into patent-eligible applications. The claims at issue do not require any nonconventional computer, network, or display components, or even a "non-conventional and non-generic arrangement of known, conventional pieces" . . . .

Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information.

*Id.* (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–52 (Fed. Cir. 2016)).

## B. Applying Those Principles to This Case

### 1. The '297 Patent

The '297 patent is entitled "Distributing Data Messages to Successive Different Subsets of Group Members Based on Distribution Rules Automatically Selected Using Feedback From a Prior Selected Subset." The patent is directed to a computer-implemented method for automatically distributing messages to a subset of members of a community, receiving feedback regarding the relevance of the messages to those members, then distributing other messages to another subset of the community based on the feedback received from the first subset. Illustrative claim 1 states as follows:

A computer-implemented method for distributing data messages to members of a user community over a data network, the method comprising:
using at least one computer system configured to
   (a) store a plurality of distribution rules, each rule comprising a respective set of instructions enabling a data processor to determine subsets of members to whom a data message is to be transmitted;
   (b) select a first distribution rule and send a first data message to a first subset of members over said data network in accordance with said first rule;
   (c) receive feedback data in respect of the first data message from one or more of the first subset of members; and
   (d) automatically select a second distribution rule from the plurality of distribution rules in dependence on the feedback data received in (c) in respect of the first data message, the selected second rule being a rule which meets a predefined criterion or criteria based on the received feedback, the selected second rule being assigned for use in sending a

> second data message to a second, different, subset of members over said
> data network.

MGL argues that the claims of the '297 patent "are not meaningfully different" from the patents the Federal Circuit held ineligible in *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016), and in particular the '142 patent that was held invalid in that case. *See* 838 F.3d at 1316–19. The Court agrees.

In the *Symantec* case, the '142 patent related to "systems and methods for receiving, screening, and distributing e-mail." *Id.* at 1316. Drawing an analogy to a corporate mailroom, the Federal Circuit found that the patent was directed to the application of an abstract idea—the "conventional business practice" of screening messages—as applied in the context of electronic communications. *Id.* at 1318. Like the screening and distribution patent in *Symantec*, the '297 patent is clearly directed to an abstract idea—distributing information based on feedback from people receiving that information. *See Enfish*, 822 F.3d at 1335 ("[F]undamental economics and conventional business practices are often found to be abstract ideas, even if performed on a computer."); *Symantec*, 838 F.3d at 1318 ("[W]ith the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper."). Such a routine business practice has been employed in multiple settings, such as direct mail marketing. Based on the purchasing activity (i.e., feedback) of a subset of a community that receives general marketing material, the next round of direct mail marketing can be tailored in light of the expressed purchasing preferences of that subset, and distributed to a second subset of the community that shares certain known characteristics with those in the first subset who expressed particular purchasing preferences.

Relying on the Federal Circuit's decisions in *Enfish* and *Visual Memory*, British Telecom argues that the '297 patent's claims "are directed to specific improvements in messaging systems,"

and that claim 1 is "rooted in improving telecommunication technology." Dkt. No. 32, at 16–17. Any such improvement in messaging systems, however, is merely the consequence of using commonly understood distribution techniques "in the context of electronic communications." *See Symantec*, 838 F.3d at 1318. And nothing about the invention constituted an improvement in telecommunications technology.

In *Enfish* the claimed invention was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory," and in *Visual Memory* the claimed invention "obviat[ed] the need to design a separate memory system for each type of processor . . . [and] avoid[ed] the performance problems of prior art memory systems." *Enfish*, 822 F.3d at 1327; *Visual Memory*, 867 F.3d at 1259. The claims of the '297 patent, by contrast, are not directed to a specific improvement to the way computers operate. Instead, the improvements touted by British Telecom, such as reducing waste of processing resources, storage, and bandwidth, *see* Dkt. No. 32, at 17 (citing Dkt. No. 17, ¶ 134), are generic to any communication system that employs a filtering feedback mechanism, whether conventional or computer-implemented.

With respect to the inventive concept step, British Telecom argues that "the patent claims recite a non-conventional combination of technical functions that improve upon prior art messaging systems." Dkt. No. 32, at 19. According to British Telecom, the improvements include "enabling the messaging system to send more pertinent information to users without overwhelming the users with numerous messages," and "reduc[ing] the volume of information that the messaging system needs to process and transmit to users." *Id.* at 19–20. The Court disagrees.

There is nothing inventive about distributing information, receiving feedback, and distributing information to a different set of recipients based on that feedback. Moreover, the implementation of that abstract idea through a computer program, i.e., creating an automated

distribution and feedback mechanism, is routine and conventional. The claims of the '297 patent merely call for generic computer components to perform generic functions. *See Symantec*, 838 F.3d at 1318.

Claim 1 of the '297 patent recites implementing the distribution method using "at least one computer system," in which "a data processor" determines, based on a plurality of distribution rules, where messages will be sent over a "data network." According to the specification, the claims can be "implemented in software stored on a central messaging server connected to a plurality of user terminals via respective network connections," with communication initiated "over the Internet via the messaging server." '297 patent, col. 8, ll. 28-33. Moreover, the "interpreter process," which is responsible for applying the selected distributed rule to a message event, can be "implemented as a rule engine or java interpreter," and "simple implementation can be achieved by writing a parser/interpreter using Java CC." *Id.* at col. 9, ll. 40-46. That description of the program's operation amounts to "[s]tating an abstract idea while adding the words 'apply it with a computer,'" which is not enough to render the subject matter patent-eligible. *Alice*, 573 U.S. at 223; *see BASCOM*, 827 F.3d at 1350 (Claims that "merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components . . . would not contain an inventive concept.").

British Telecom also argues that the Patent Office "recognized this nonconventional combination of features as a patentable improvement over the prior art." Dkt. No. 32, at 19. But the fact that a patent application may be patentable over prior art does not mean that it is directed to patent-eligible subject matter. If a patent examiner's conclusion that a patent application satisfied the novelty requirement of sections 102 and 103 of the Patent Act were enough to satisfy the "abstract idea" and "inventive concept" steps of the *Alice* test, no issued patent would ever be

invalidated on section 101 grounds.  *See IPA Techs., Inc. v. Amazon.com, Inc.*, Civil Action No. 16-1266, 2019 WL 259100, at *10 (D. Del. Jan. 18, 2019) (facts such as the examiners' recitations of why they found the patents to be novel "are not properly considered in determining a motion to dismiss for patent ineligibility under § 101.  Every patent that is issued is generally (and often specifically) issued over prior art references and is found to be novel.").

The Supreme Court has explained that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories."  *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981); *see Mayo*, 566 U.S. at 90 ("We recognize that, in evaluating the significance of additional steps, the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap.  But that need not always be so."); *see also Data Engine*, 906 F.3d at 1011 ("The eligibility question is not whether anyone has ever used tabs to organize information.  That question is one of novelty reserved for §§ 102 and 103.").

The Federal Circuit summarized that point recently as follows:

> We may assume that the techniques claimed are "[g]roundbreaking, innovative, or even brilliant," but that is not enough for eligibility.  Nor is it enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103.  The claims here are ineligible because their innovation is an innovation in ineligible subject matter.

*SAP America*, 898 F.3d at 1163 (citations omitted); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea."); *Symantec*, 838 F.3d at 1315 ("While the claims may not have been anticipated or obvious[,] . . . that does not suggest that the idea of 'determining' and 'outputting' is not abstract, much less that its implementation is not routine and conventional.") (citation omitted); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1376 (Fed. Cir. 2016) ("That is, under the *Mayo/Alice*

framework, a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere 'well-understood, routine, conventional activity.'") (quoting *Mayo*, 556 U.S. at 73). The Court therefore holds that the '297 patent is directed to ineligible subject matter.

## 2. The '040 Patent

The '040 patent is entitled "Telecommunications Apparatus and Method." The invention is directed to "apparatus and methods for delivering information to mobile users in a telecommunications system." '040 patent, col. 1, ll. 8-10. The specification describes the invention as providing for the delivery of shortlists of location-specific information to mobile users based on user preferences. *Id.* at col. 3, ll. 16-18 ("Dual filtering, both according to the location of the user and in accordance with pre-stored preference information, can be used to provide particularly useful shortlists."). Illustrative claim 1 states as follows:

> A method of selecting information sources from which information is provided to users via a telecommunications system, said method comprising:
>> tracking the location of a user in the system by receipt of tracking information for said user;
>> accessing location data indicating localities in which information from the respective sources is deemed to be relevant;
>> generating a shortlist of information sources for said user on the basis of said tracking information and said location data; and
>> transmitting said shortlist to a terminal associated with said user so as to allow said user to select an information source of interest and thereby to access information from said source.

MGL argues that the '040 patent is directed to an abstract idea: providing "lists of location-specific information sources to users based on their location." Dkt. No. 34, at 8. The Court agrees.

In both *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363 (Fed. Cir. 2015)*,* and *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266 (Fed. Cir. 2016), the

Federal Circuit addressed patents directed to customizing the provision of content based on information known about the user, such as where the user lives. *Capital One Bank*, 792 F.3d at 1369; *Affinity Labs*, 838 F.3d at 1271. In both cases, the court held that tailoring content to a user or, in the computer setting, customizing a user interface for the user, is an abstract idea.

In the *Capital One Bank* case, the court observed that tailoring the provision of information to a user's characteristics is a "fundamental . . . practice long prevalent in our system." 792 F.3d at 1369 (quoting *Alice*, 573 U.S. at 219). By analogy, the court noted, "newspaper inserts had often been tailored based on information known about the customer—for example, a newspaper might advertise based on the customer's location. Providing this minimal tailoring—e.g., providing different newspaper inserts based upon the location of the individual—is an abstract idea." *Id.* The same is true of the '040 patent, which provides for the customization of information based on the location of the user, adding only the proviso that the system will provide different information to the user when the user's location changes.

Similarly in the *Affinity Labs* case, the patent was directed, *inter alia*, to a "customized user interface." Like the basic concept of tailoring content to a user, the court explained, the basic concept of customizing a user interface is an abstract idea. 838 F.3d at 1271. The court explained that "tailoring of content based on information about the user—such as where the user lives or what time of day the user views the content—is an abstract idea that is as old as providing different newspaper inserts for different neighborhoods." *Id.*; *see also Evolutionary Intelligence LLC v. Sprint Nextel Corp.*, 677 F. App'x 679 (Fed. Cir. 2017) (holding that claims directed to "systems and methods for allowing computers to process data that are dynamically modified based on external-to-the-device information, such as location and time" are patent-ineligible).

In *Jedi Techs., Inc. v. Spark Networks, Inc.*, No. CV 1:16-1055-GMS, 2017 WL 3315279, at *7 (D. Del. Aug. 3, 2017), this court confronted a similar question of patent eligibility with regard to a patent that was drawn to what the court referred to as "the abstract idea of matching people based on criteria such as personality traits or location." The court found that "[t]he patent's foundation rest[ed] upon the notion of human compatibility and matchmaking . . . [which are] concept[s] that fall[] within the proscriptions of § 101." *Id.*

The '040 patent rests on concepts that are similarly "not novel and ha[ve] been performed by humans for a very long time." *See id.* Updating information based on a person's location, and filtering and summarizing that information into shortlists based on a person's preferences or needs are common practices performed by a variety of individuals and entities, such as travel agents, realtors, and online services operated by companies with a widespread network of retail outlets. In such systems, if a person's location changes, the filtering of information, whether done by a travel agent, a realtor, or an online "store locator" service, will provide different information based on the person's updated location.

Again relying on *Enfish* and *Visual Memory*, British Telecom argues that the '040 patent "is directed to specific solutions to specific problems in the software and telecommunication arts." Dkt. No. 32, at 10; *see Enfish*, 822 F.3d at 1336 ("[T]he claims at issue . . . are not directed to an abstract idea . . . [,] [r]ather, they are directed to a specific improvement to the way computers operate"; *Visual Memory*, 867 F.3d at 1259 (same). British Telecom states that "[g]enerating and sending a shortlist of information sources to a user prevents a user from being overwhelmed with irrelevant and/or out of context information, reduces the amount of data the network and backend servers would otherwise have to process and transmit, and reduces the amount of data for the user's smartphone to display." Dkt. No. 32, at 11. But sending and displaying voluminous data is not a

specific problem in the software and telecommunication arts. It is a problem inherent to data management generally. In any context, the reduction of information to a shortlist will necessarily reduce the amount of data that is communicated between a source and a recipient, and thus reduce the amount of data that a recipient must view. *See Jedi Techs.*, 2017 WL 3315279, at *8 ("[T]he mere application of modern technology to the field of 'invention' does not somehow transform or otherwise change the character of the abstract idea."). Nothing about the problem addressed by the '040 patent or the solution offered by the patent has anything to do with solving problems in the design of computers or telecommunications systems. Therefore, *Enfish* and *Visual Memory* are inapplicable here.

With respect to the inventive concept step, British Telecom argues that the "arrangement of claimed functions," including generating a shortlist of information on the basis of a user's location and transmitting that shortlist to the user, is "non-conventional." Dkt. No. 32, at 14–15. For additional support, British Telecom points to the patent's discussion of "inventive programming" in the form of "agent" programs. *See id*. at 15–16.

There is nothing inventive about the generation and transmission of a list of information sources based on user location. The generation of such lists has long been well-understood, routine, and conventional, as explained above. Nor do the claims recite any novel type of information or a new way of gathering, cataloguing, or transmitting that information. *See Elec. Power Grp.*, 830 F.3d at 1355 ("The claims in this case do not [] require a new source or type of information, or new techniques for analyzing it. . . . As a result, they do not require an arguably inventive set of components or methods."). The apparatus and method contemplated by the patent could be replaced by a travel agent who receives a phone call from a traveler and then provides the traveler with a list of restaurants near the traveler's location. *See Jedi Techs.*, 2017 WL

3315279, at *8 (Court found no inventive concept in part because "the generic computer system contemplated by the patent could be replaced with a human matchmaker"). The lack of any inventive concept is exemplified in the patent itself. The background section of the '040 patent acknowledges that delivering tailored, personalized information based on user preferences, and routing locality-dependent information to a user, were methods that were already known. '040 patent, col. 1, line 43, through col. 2, line 32.

The '040 patent merely requires the use of familiar, generic components to accomplish the claimed method. For example, claim 1 recites two technological components: "a telecommunications system" to serve as the network over which information is communicated, and a "terminal" to allow the user to select an information source of interest. The specification describes the telecommunications system as formed by "a number of different communications channels," including a public switched telephone network (PSTN), an integrated services digital network (ISDN), or a public land mobile network (PLMN), all of which were conventional communication means. *Id.* at col. 4., ll. 40-61. The specification also lists numerous terminals, including: a cellular telephone; a personal digital assistant; a facsimile apparatus and conventional telephone; and a computer workstation, all of which were well-known devices used to perform familiar tasks. *Id.* at col. 4, ll. 24-29. As in *Electric Power Group*, "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." *Elec. Power Grp.*, 830 F.3d at 1355.

The discussion of "agent" programs in the specification fails to render the '040 patent-eligible. An "agent" program is nothing more than a generic computer program described using functional language; the specification describes an "agent" program as "an independently

27

executing control program under control of which a computer or computer controlled switching centre performs the functions attributed to the 'agent.'" '040 patent, col. 6, ll. 4-7. More importantly, as noted by MGL, references to "agent" programs do not confer patent eligibility because they are described only in the patent specification; and "an *Alice* analysis concerns itself with claim language, not unclaimed features." Dkt. No. 34, at 8 (citing *Mentor Graphics Corp.*, 839 F.3d at 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.")); *see also Alice*, 573 U.S. at 221 ("[W]e must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."); *Return Mail, Inc. v. U.S. Postal Serv.*, 868 F.3d 1350, 1369 (Fed. Cir. 2017); *RecogniCorp.,* 855 F.3d at 1327; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Accenture*, 728 F.3d at 1345.

Lastly, British Telecom states that "[t]he Patent Office expressly recognized this nonconventional combination of features as a patentable improvement over the prior art." Dkt. No. 32, at 14. Yet, as recognized above, "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories." *Diehr*, 450 U.S. at 188–89. Therefore, the '040 patent is directed to ineligible subject matter and is invalid.

### 3. The '450 Patent

The '450 patent is entitled "Network Data Visualization System and Method for Downloading Visualization Software to a User Station after User Authentication." It is directed to a system and method for downloading and using software that creates visual depictions of data,

such as charts and graphs, and does so at a user station after user authentication. *See* '450 patent, Abstract. Illustrative claim 15 of the '450 patent states:

> A method of providing data visualisation to a remote user, of data stored in a database in a form which can be queried by a data visualisation software tool, which method comprises:
> > storing the data visualisation software tool in a computer system,
> > receiving a request to the computer system from a remote user for the tool,
> > authenticating the request and outputting or copying the tool to the user,
> > receiving a request from the user for data from the database by means of the tool,
> > accessing the database, and
> > providing the data to the user,
> > wherein the data comprises communications traffic data in a network.

Vimeo argues that the '450 patent is directed to the abstract idea of data visualization in a conventional computer architecture. *See* Dkt. No. 23, at 10–12. The Court agrees.

The Federal Circuit has held that collecting information, analyzing information, and presenting the results of that analysis are abstract ideas. *See Elec. Power Grp.*, 830 F.3d at 1353–54 (collecting cases).[2] That includes the encoding and decoding of image data, storing and classifying it, and making it available to users on demand. *See RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d at 1326–27; *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 611–13. The circuit court has also held that providing restricted access to resources is an abstract idea. *See Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 Fed. Appx. 1014, 1017 (Fed. Cir. 2017). And the use of computers to provide remote access to information has been held to be abstract. *See Pres. Wellness Techs. LLC v. Allscripts Healthcare Sols.*, No. 2:15-CV-1559, 2016 WL 2742379, at *7 (E.D. Tex. May 10, 2016) ("[T]he introduction of computers for storing the records, providing remote access to them, and controlling access based on eligibility does not render [an] abstract idea any less

---

[2] Vimeo's real-world analogue, Charles Minard's 1861 graph representing the losses suffered in Napoleon's Russian campaign, exemplifies the universality of such processes.

abstract."); *see generally Mayo*, 566 U.S. at 84 ("[S]imply implementing [an abstract idea] on a physical machine, namely a computer, was not a patentable application of that principle.").

Adding a data visualization tool that is made available to a user on demand does not make the concept any less abstract. Thus, the claims of the '450 patent "are clearly focused on the combination of those abstract-idea processes" and are therefore directed to an abstract idea. *Elec. Power Grp.*, 830 F.3d at 1354.

Again citing *Enfish* and *Visual Memory*, British Telecom argues that the '450 patent claims "are directed to specific implementations of a solution to a problem in the software arts." Dkt. No. 28, at 12. It argues that the invention "provides 'a way to give remote access to data, together with visualization capability, to non-technical users.'" *Id.* (quoting Dkt. No. 17, ¶ 72; '040 patent, col. 1, ll. 47-49). According to British Telecom, the '450 patent "improves the function and operation of the visualization system itself rather than performing some well-known function with a computer used in its ordinary capacity." *Id.* Therefore, British Telecom asserts, Vimeo's opening brief oversimplifies the technology recited in the '450 patent.

As discussed above, the steps of authenticating, accessing, and controlling the presentation of electronic data, individually and in combination, are plainly abstract. And unlike the self-referential database of *Enfish* or the improved computer memory system of *Visual Memory*, which were improvements to computer functionality itself, the invention of the '450 patent does not offer a solution to a problem in the computer hardware or software arts. The idea of storing data "in a form which can be queried by the data visualization software tool when downloaded to the user location," '450 patent, col 2, ll. 10-12, as recited in claim 15, may well enhance access to data and make visualization of data easier for non-technical users when such tools are made available to

them.  But those ideas, which are at the heart of the '450 patent, do not represent "a specific improvement to the way computers operate."  *See Enfish*, 822 F.3d at 1336.

Unlike the inventions in *Enfish* and *Visual Memory*, the '450 patent discloses no novel database structure or data visualization tool.  It merely recites making conventional data visualization applets available to users upon demand and ensuring that the data of interest is stored in a manner that it can be accessed by those applets.  As such, the patent is directed to an abstract idea, not an improvement in computer functionality.

British Telecom again argues that "[t]he Patent Office expressly recognized [the invention as an] improvement over the prior art."  Dkt. No. 28, at 13.  However, as noted above, "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories."  *Diehr*, 450 U.S. at 188–89; *see Mayo*, 566 U.S. at 90 ("We recognize that, in evaluating the significance of additional steps, the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap.  But that need not always be so."); *see also Data Engine*, 906 F.3d at 1011 ("The eligibility question is not whether anyone has ever used tabs to organize information.  That question is one of novelty reserved for §§ 102 and 103.").

With regard to the inventive concept step, Vimeo argues that "[t]he claims of the '450 [p]atent do not describe any inventive concept that converts this abstract idea to patent-eligible subject matter."  Dkt. No. 23, at 12.  Vimeo points to language throughout the patent specification that refers to all the technological components used in the invention's embodiments as "known" or "currently available."  *Id*. at 12–13.  Additionally, Vimeo argues that the '450 patent provides no inventive code or algorithms that might generate a visualization tool.  Instead, according to Vimeo, the patent "merely states that the tool accesses data using HotJava's 'standard remote

access features,' and that it displays the data using HotJava's 'existing library functions.'" *Id.* at 13 (quoting '450 patent, col. 5, l. 62, through col. 6, l. 1; col. 6., ll. 21-23; col. 7, ll. 13-14).

For its part, British Telecom argues that the claims recite "both (i) inventive programming and (ii) an inventive distribution of functionality within a computing network," and that the claims therefore embody an inventive concept. Dkt. No. 28, at 13 (quoting Dkt. No. 17, ¶ 73). To bolster its argument, British Telecom likens the claims of the '450 patent to the claims at issue in *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). In *BASCOM*, the Federal Circuit concluded that claims directed to a "content filtering system for filtering content retrieved from an Internet computer network" were abstract, but were nonetheless patent-eligible because they embodied an "inventive concept" under step 2 of the two-step test set forth in *Alice*. The Federal Circuit held that while "the limitations of the claims, taken individually, recite generic computer, network and Internet components," the claims "recite a specific, discrete implementation of the abstract idea of filtering content." *Id.* at 1350. It explained that "[b]y taking a prior art filter solution (one-size-fits-all filter at the ISP server) and making it more dynamic and efficient (providing individualized filtering at the ISP server), the claimed invention represents a software-based invention [] that improve[s] the performance of the computer system itself." *Id.* at 1351 (internal quotations and citations omitted). According to British Telecom, the claims in the '450 patent, like the claims at issue in *BASCOM*, are not conventional or generic.

The Court agrees with Vimeo. First, as noted, the data visualization software tool disclosed in the '450 patent does not represent inventive programming, and no inventive data monitoring tool is recited in the claims. The '450 patent acknowledges that the "[d]ata visualisation techniques [disclosed in the specification were] known and clearly useful." '450 patent, col. 1, ll. 22-23. To visualize data at the time of the patent, "data [was] generally stored locally" and "each set of data

[was] approached with the user writing software to produce a different visualisation." *Id.* at col. 1, ll. 40-43. The patent merely envisions the use of known visualization software in a user-friendly, pre-written format (i.e., applets). Yet, making well-known visualization software available on applets was also not inventive. In the "Telephone Traffic Data Visualization" example set forth in the '450 specification, the patentees explained that "[a] geometry package has been developed which can be used as a platform for other visualisation applets that require the user to be able to manipulate a graphical object on the screen." *Id.* at col. 6, ll. 13-16. The available functions in that geometry package were characterized as "standard computer graphics technique[s]," including rotation, scaling, translation, and reset. *See id.* at col. 6, ll. 17-49. The remainder of the specification likewise fails to disclose any inventive component for the visualization software tool, instead discussing the development of the software in purely generic terms. *See id.* at col. 8, ll. 36-38 ("The additional software developed to produce this system includes the visualization application itself, written in Java").

Furthermore, the claims of the '450 patent fail to limit the data visualization software tool to a "specific, discrete implementation" featuring a technological improvement. *See BASCOM*, 827 F.3d at 1350. Rather, the claims are functional in nature. Claim 1 states that the data visualization software must allow for "selecting and controlling presentation of the data." Additional claims add that the tool must be, *inter alia*, downloadable onto a browser, outputted or copied to a user station, able to query a database, and stored in a computer system.[3] *See* '450 patent, claims 6, 15. As noted in the specification, however, such software functionality was

---

[3] The descriptions of the data visualization software in the claim language closely follow the conventional functionality of the software, as depicted in the flow charts set forth in Figures 2 and 6 of the '450 patent.

already well known.  *See id.* at col. 4, ll. 22-27 ("[A] browser having capabilities equivalent to those of 'HotJava' . . . is required.  That is, the browser should be able to retrieve not only text and images . . . but also sections of executable code"); *id.* at col. 4, ll. 35-36 (The sections of code are "loaded automatically by the browser.").  Together, the discussions of the data visualization software tool in the claims and in the specification do not satisfy the "inventive concept" requirement embodied in step 2 of the *Alice* test for subject-matter eligibility.  *See BASCOM*, 827 F.3d at 1350–51.

Second, the '450 patent does not disclose an inventive way of distributing functionality within a computing network.  What British Telecom describes as inventive is merely a generic computing network providing remote access to a database.  According to the specification, the network is arranged as follows: the user accesses the remote computer system via "a known protocol"; an existing World Wide Web browser is provided to the user in a "known manner"; the browser retrieves text, images, and executable [data visualization] code in ways similar to "a HotJava browser"; the code is written in the "java programming language"; and the code is "loaded automatically by the browser," as described at "http://java.sun.com."  '450 patent, col. 4, ll. 8-39.  That all amounts to a generic arrangement of known, conventional computer components.  *See BASCOM*, 827 F.3d at 1350.  Incorporating additional generic features, such as user authentication and user-friendly data visualization tools (as discussed above) does not give the recited computer network the character of an inventive concept.[4]  *See Elec. Power Grp.*, 830 F.3d at 1356 ("The

---

[4]  In its brief, British Telecom argues that the patent discloses a "nonconventional and inventive arrangement" that enables "a non-technical user . . . to control the manner of presentation so that the data is presented in a graphic and understandable way."  Dkt. No. 28, at 3 (quoting '450 patent, col. 2, ll. 15-18).  While the specification touts that feature, it is not found in any of the claims, and even the reference in the specification is not accompanied by any explanation of how

claims in this case . . . do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology."). Therefore, the '450 patent is directed to ineligible subject matter and is invalid.

### 4. The '079 Patent

The '079 patent is entitled "Communications Node For Providing Network Based Information Service." The patent relates to a method for providing an information service in an intelligent communications network. *See* '079, Abstract; *id.* at col. 1, ll. 9-12. The invention features a node that acts as an intermediary between a customer and the information sources of interest. *See id.* at Fig. 1, 3. The node permits a customer, upon entering a user identification and a proper password, to select an information item from a list of available information sources (based on the customer's access rights). *See id.*; *see also id.* at col. 3, line 53, through col. 7, line 40. Once an information item is selected, the node retrieves that item from an information service provider database and sends it to the customer. *See id.* at col. 3, line 53, through col. 7, line 40. The invention purports to replace prior data retrieval methods, in which "for each item that a person wishe[d] to have access to, a separate access procedure (logon to the Provider) ha[d] to be performed, including providing a personal identification number." *Id.* at col. 1, ll. 35-38. In effect, the node centralizes the data retrieval process. Illustrative claim 21 states as follows:

> A method of operating a communications network to provide a network-based information service, the method comprising the following steps:
> > step a—storing customer identities, respective customer-associated lists of identities of information items, hereinafter referred to as items, for which the respective associated customer has access rights, and identities of

───────────────────

the invention allows the user to control the manner of presentation, other than by storing the data in a central database and downloading a data visualization tool upon request by a user.

item-associated information sources from which the respective items can be retrieved;

step b—receiving at the network a message requesting access to the information service and comprising at least a customer identity;

step c—reading the contents of the received message;

step d—retrieving from storage the list of information item identities associated with the received customer identity;

if no item identity is received in step b,

step e1—sending said list to the customer; and

step e2—reading an item identity from a further message received from the customer;

or, on the other hand, if an item identity is received in step b,

step f—ascertaining whether or not that received item identity is in said list; and for such item identity received in step b, if it is ascertained in step f that said received item identity is in said list, or, alternatively, for the item identity received in step e2, as the case may be,

step g—ascertaining the identity of the information source associated with that received item identity;

step h—retrieving the requested item from that information source; and

step i—sending at least the first page of the retrieved item to the customer.

That lengthy set of limitations can be summarized, without distortion or loss of specificity, as follows:  A method entailing storing a customer's identity and the list of items as to which that customer has access rights and, when the customer requests one of the items for which the customer has access rights, obtaining that item from the source and sending it to the customer.  If the message does not contain a request for access to an item, the customer will be sent a list of all the items to which he has access rights.

Vimeo argues that the '079 patent is drawn to the abstract idea of accessing restricted information based on identity.   Dkt. No. 23, at 15.   British Telecom challenges that characterization, arguing that the '079 patent claims "are directed to specific solutions to specific problems in content distribution systems."  Dkt. No. 28, at 17.  According to British Telecom, the claimed arrangement of features "improves the function and operation of a content distribution system by reducing the frequency and multiplicity of login credentials that a user must enter to access content from multiple content sources."  *Id.* at 18–19.

The Court agrees with Vimeo that the '079 patent is drawn to an abstract idea. Maintaining a centralized clearinghouse for information obtained from multiple sources and distributed to multiple customers can reduce the burden on customers who otherwise would have to make multiple separate requests to multiple information sources. But the concept of such a clearinghouse for information fits squarely within the category of "fundamental economic and conventional business practices," *Enfish*, 822 F.3d at 1335, that the Federal Circuit has repeatedly held to be abstract ideas. Non-computer-based analogues to such an information clearinghouse can be found in various fields. Many examples come to mind, such as a television service that allows a customer access to all of the television stations for which the customer has paid the subscription fee; a lending library that allows customers to have access to different categories of books or other materials obtained from a variety of sources depending on the customer's preferences and eligibility to receive materials from those sources; a china and silverware replacement service that allows customers who sign up for the service to obtain replacements for missing or broken items without having to search each of a large number of potential providers; or a college record-keeping system that provides different degrees of access to a student's records depending on whether the record requester is the student, an administrator, a professor, or a healthcare professional affiliated with the college.

The Federal Circuit's decision in *Smartflash LLC v. Apple LLC*, 680 F. Appx. 977 (Fed. Cir. 2017), is closely analogous to this case. There, the court invalidated three patents related to a data carrier for storing and paying for data, and to computer systems for providing access to data to be stored. The claimed data carriers received and validated payments from users and then retrieved and provided data to the users. *Id.* at 978–79. The court found that the asserted claims "invoke computers merely as tools to execute fundamental economic practices, in particular

retrieving and providing data subject to payment validation and "access/use rule[s]" specifying conditions for accessing and using the retrieved data. *Id.* at 982. As such, the court concluded, "the asserted claims are directed to the abstract idea of conditioning and controlling access to data based on payment." *Id.* at 982–83.

Notably, the claims of the '079 patent contain no limitations regarding how that abstract idea is implemented. Because the claims recite no algorithm or other mechanism for effecting the task, they read on any implementation of the abstract idea, thus preempting any method of achieving the same end. As such, the claims are directed to the abstract idea *simpliciter*, and thus do not satisfy the first step in the two-step analysis of patent eligibility under *Alice*. *See Symantec*, 838 F.3d at 1316 (quoting *Internet Patents*, 790 F.3d at 1347) ("[W]hen a claim directed to an abstract idea 'contains no restriction on how the result is accomplished . . . [and] [t]he mechanism . . . is not described, although this is stated to be the essential innovation,' then the claim is not patent-eligible.").

In response, British Telecom makes two points. First, British Telecom notes that "this District previously recognized the advantages of this feature in its claim construction order in a prior lawsuit." Dkt. No. 28, at 18. That, however, is a mischaracterization of the claim construction order to which British Telecom refers. The order, in a prior case, merely states that "[t]he '079 patent relates generally to providing users with information originating from multiple services through a single portal with a single password." Dkt. No. 29, Ex. C, at 9. That summary of the '079 patent falls far short of the endorsement of the patent's advantages that British Telecom claims it to be.

Second, British Telecom states that "[t]he Patent Office acknowledged that this arrangement of elements was a patentable improvement over prior art." Dkt. No. 28, at 18. But,

as bears repeating once again, "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories." *Diehr*, 450 U.S. at 188–89.

As for the inventive concept step, Vimeo argues that "[t]he '079 [p]atent's claims recite no feature that confers an inventive idea upon them." Dkt. No. 23, at 18. According to Vimeo, the claim terms "refer to general components of an information system" and nothing suggests that the "network, storage, or information sources [recited in the claim language] are in any way novel or unique." *Id.* British Telecom disagrees and argues that the patent claims "recite a non-conventional combination and arrangement of claimed functions" including storing customer-associated lists at a node that identifies content that a user has the right to access, and then sending the list to the customer. Dkt. No. 28, at 19.

First, as noted by Vimeo, British Telecom "does not dispute that the claims rely on conventional, routine telecommunications features to perform the claimed operations." Dkt. No. 30, at 8; *see* Dkt. No. 28, at 19–20; *see also* Dkt. No. 17, at 37. Therefore, as in *Electric Power Group*, the claims here "merely call for performance of the claimed information collection, analysis, and display functions 'on a set of generic computer components' and display devices." *Elec. Power Grp.*, 830 F.3d at 1355.

Second, the Court discerns no inventive concept in the combination and arrangement of the claimed features. Claim 21 recites the following steps: storing customer identities, including lists of identities of information items for which the customer has access rights; receiving a request for access to this information from a customer identity; retrieving the list of information associated with the customer identity; checking whether the requested information is included in the list; and if so, retrieving and sending the requested information to the customer. The Federal Circuit has

found steps such as these, controlling access to resources, to be conventional. *See Prism Techs.*, 696 F. Appx. at 1017 ("T-Mobile argues that the asserted claims recite ineligible subject matter because they: (1) are directed to the abstract idea of controlling access to resources; and (2) are non-inventive because they recite generic computer hardware running generic computer software that performs the abstract functions routine to the process of restricting access. We agree."). The circuit court has also recognized that collecting information and transmitting that information over a network is conventional. *See Elec. Power Grp.*, 830 F.3d at 1355 ("[S]electing information, by content or source, for collection . . . does nothing significant to differentiate a process from ordinary mental processes"); *Two-Way Media*, 874 F.3d at 1339 (claim 1 [a method for transmitting message packets over a communications network] is not an inventive concept); *RecogniCorp*, 855 F.3d at 1328 ("[C]laim 1 is directed to the abstract idea of encoding and decoding. The addition of a mathematical equation that simply changes the data into other forms of data cannot save it."); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Smartflash LLC*, 680 F. Appx. at 983 ("writing data to implement an abstract idea on a computer does not transform the nature of the claim into a patent-eligible application") (internal quotations and citation omitted). Combining these two features in a particular technological environment (i.e., a node) fails to move the abstract idea of centralizing content into patent-eligible territory. *See buySAFE*, 765 F.3d at 1354. Therefore, the '079 patent is also directed to ineligible subject matter and is invalid.

### 5.    The Other Claims

The defendants' briefing is mainly focused on the illustrative claims of each patent cited in British Telecom's complaint and the accompanying infringement chart. But Vimeo and MGL

also briefly discuss the impact of the other claims of each patent. *See* Dkt. No. 23, at 14–15, 19; Dkt. No. 25, at 13, 17. The defendants argue that their analysis of the illustrative claims applies equally to the other independent claims of the challenged patents. *See* Dkt. No. 23, at 14 ("All claims of the '450 patent refer to this abstract idea of visualizing data. . . . Thus, the foregoing analysis applies to all claims"); Dkt. No. 23, at 19 ("The basic operation of claim 21 is repeated throughout independent claims . . . . The foregoing analysis also applies to these claims"); Dkt. No. 25, at 13 ("All of the independent claims of the '297 Patent . . . refer to this same abstract idea"); Dkt. No. 25, at 17 ("All independent claims . . . refer to this basic abstract idea"). The defendants also argue that the dependent claims merely recite abstract or otherwise routine features, or limit the claims to particular settings, and thus do not convert the contents of the dependent claims into patent-eligible subject matter. *See Bilski*, 561 U.S. at 612 ("[A]dding token postsolution components [does] not make the concept patentable."); *Diehr*, 450 U.S. at 191–92 (The prohibition against patenting abstract ideas "cannot be circumvented by attempting to limit the [patented invention] to a particular technological environment" or adding "insignificant postsolution activity."); *Parker v. Flook*, 437 U.S. 584, 590 ("The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance."); *Automated Tracking Solutions, LLC v. Coca-Cola Co.*, 723 F. App'x 989, 991 (Fed. Cir. 2018) ("In a § 101 analysis, courts may evaluate representative claims."); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d at 1264 (dependent claims all recited functions that were not inventive but simply constituted "particular choices from within the range of existing content or hardware"); *Internet Patents*, 790 F.3d at 1349 (additional limitations of the dependent claims held not to add an inventive concept, for "they represent merely generic data collection steps or siting the ineligible concept in a particular technological

environment"); *Content Extraction*, 776 F.3d at 1349 (dependent claims did not add any inventive concepts, but merely recited routine and conventional functions of scanners and computers); *Fort Properties, Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323–24 (Fed. Cir. 2012) ("AML simply added a computer limitation to claims covering an abstract concept—that is, the computer limitation is simply insignificant post-solution activity.").

British Telecom has not addressed the defendants' challenges to those other claims. British Telecom states that it analyzed only the illustrative claim for each patent "because that is the only claim [the defendants] substantively challenge." Dkt. No. 28, at 12 n.3, 17 n.4; Dkt. No. 32, at 10 n.5, 17 n.6. As demonstrated above, however, the defendants have substantively challenged all claims of the patent at issue. Therefore, the Court finds that by not pointing to any distinguishing feature of the other claims that would affect the issue of patent eligibility, British Telecom has waived any argument that any of the other unspecified claims are directed to patent-eligible subject matter based on the additional limitations beyond those recited in the illustrative claims.

### C. The Appropriateness of Resolving This Case on a Motion to Dismiss

The Federal Circuit's decisions in *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018), and *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), held that the question whether a claim is directed to subject matter that is "well-understood, routine, and conventional" for purposes of the "inventive concept" inquiry can sometimes raise issues of fact that would preclude dismissal under Rule 12(b)(6). Relying on those decisions, British Telecom argues that "[a]ny dispute over the nonconventional nature of [the patents] is merely a dispute of fact . . . and cannot be resolved at this procedural stage." Dkt. No. 32, at 20; *see* Dkt. No. 32, at 16; Dkt. No. 28, at 17; Dkt. No. 28, at 20. The Court disagrees.

*Aatrix* and *Berkheimer* do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel and nonconventional. First, section 101 does not turn on novelty, and thus the fact that British Telecom's patents had features distinct from those found in the prior art does not mean that the claims necessarily incorporate an "inventive concept." Second, *Aatrix* and *Berkheimer* required detailed factual allegations raising issues of fact before precluding dismissal under Rule 12(b)(6). *See Aatrix*, 882 F.3d at 1127 (holding that the plaintiff could avoid dismissal because the complaint presented detailed factual allegations that the claimed invention "uses less memory, results in fast processing speed, and reduces the risk of thrashing which makes the computer process forms more efficiently"); *see Berkheimer*, 881 F.3d at 1370 (finding a genuine issue of material fact with respect to claims 4–7, but not claims 1–3). And, as noted by the defendants, British Telecom "pleads no facts, rooted in the specification or otherwise, that would support a conclusion that the patents are 'rooted in computer technology' or confer 'technical improvements.'" Dkt. No. 30, at 10; Dkt. No. 34, at 10.

District courts have frequently decided section 101 issues on motions to dismiss, and the Federal Circuit has approved of that procedure on numerous occasions, including in cases post-dating the decisions in *Aatrix* and *Berkheimer*. *See Glasswall Solutions Ltd. v. Clearswift Ltd.*, 2018 WL 6720014 (Fed. Cir. Dec. 20, 2018); *SAP Am., Inc.*, 898 F.3d at 1166 (citing cases); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018); *Burnett v. Panasonic Corp.*, 741 F. App'x 777 (Fed. Cir. 2018); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018); *Maxon, LLC v. Funai Corp.*, 726 F. App'x 797 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim

construction or significant discovery has commenced.") (citing cases); *see also Berkheimer*, 881 F.3d at 1368 (Moore, J., concurring in denial of rehearing en banc) ("Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment. Nothing in this decision should be viewed as casting doubt on the propriety of those cases.").

In this case, British Telecom has failed to highlight any features of the illustrative claims that raise a factual dispute. As discussed above, all features, individually and in combination, have been recognized by the Federal Circuit and previous district courts as generic and conventional. Accordingly, the Court believes it is appropriate to decide the section 101 issue now and spare the parties the burdens that would be incurred in delaying the disposition of the section 101 issue until later in the case.

## CONCLUSION

Vimeo and MGL's motions to dismiss, Dkt. Nos. 22 and 24, with respect to the '105 patent and the '200 patent, are denied. The Court finds that British Telecom has pleaded facts that make infringement plausible under both the '105 patent and the '200 patent. Vimeo and MGL's motions to dismiss, with respect to the '040 patent, the '297 patent, the '450 patent, and the '079 patent, are granted. The Court finds that the '040 patent, the '297 patent, the '450 patent, and the '079 patent are invalid as directed to patent-ineligible abstract ideas.

IT IS SO ORDERED.

SIGNED this 4th day of February, 2019.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE