**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BRITISH TELECOMMUNICATIONS PLC,<br><br>*Plaintiff*,<br><br>v.<br><br>IAC/INTERACTIVECORP, MATCH GROUP, INC., MATCH GROUP, LLC, and VIMEO, INC.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 18-366-WCB<br><br>**(FILED UNDER SEAL)** |

**MEMORANDUM OPINION AND ORDER**

On July 2, 2020, plaintiff British Telecommunications PLC ("BT") filed a letter raising several discovery-related complaints. Dkt. No. 215. Defendants IAC/InteractiveCorp, Match Group, Inc, Match Group, LLC, and Vimeo Inc. (collectively, "Match") filed a letter response on July 7, 2020. Dkt. No. 216. BT filed a reply on July 9, 2020. Dkt. No. 217. That same day, Match filed another letter, complaining about two alleged misrepresentations in BT's reply. Dkt. No. 219. BT filed another letter the following day disputing Match's characterization of the two alleged misrepresentations. Dkt. No. 220.

BT's original letter raises three principal issues, all of which relate to Match's contention that an algorithm that is a central feature of BT's infringement claim is no longer used (or at least is not used extensively) in Match's accused dating platform, Match.com. The algorithm is known as Alotta89 (sometimes referred to as Algo89). While the parties appear to agree that Match used that algorithm throughout the bulk of the time period for which BT is claiming past damages, BT

challenges Match's assertion, through the report of its damages expert and other recently produced evidence, that Match has discontinued its use of the Alotta89 algorithm.

First, BT contends that Clark Rothrock, a witness designated by Match to testify under Fed. R. Civ. P. 30(b)(6) on a number of technical topics, improperly submitted an "Errata Sheet" after his May 19, 2020, deposition that materially altered his testimony. The Errata Sheet, according to BT, impermissibly altered Mr. Rothrock's testimony about whether the accused algorithm is still used in Match's programs. BT contends that Mr. Rothrock's Errata Sheet should be excluded.

Second, BT objects to a spreadsheet that Match served on BT after BT had already served its opening expert reports. BT contends that the spreadsheet, which relates to the extent to which various algorithms were used at various times in Match's programs, was served belatedly and should be excluded.

Third, BT objects to the expert report served by Mr. Philip Green, Match's damages expert. In particular, BT objects to the portion of the expert report that relies on the late-produced spreadsheet and relies on conversations Mr. Green had with two Match employees to interpret the spreadsheet and help him formulate his opinion regarding the use of different algorithms in Match's system at different times. Those portions of Mr. Green's report, according to BT, should be stricken.

**1. The Rothrock Errata Sheet**

During his May 19, 2020, deposition, Mr. Rothrock testified that Match had used and was continuing to use two algorithms, known as Alotta89 and Amaranth, to power certain features of the accused dating platform operated by Match. Fact discovery closed three days after Mr. Rothrock's deposition. On June 5, 2020, BT served its opening expert reports. BT's infringement

and damages experts relied in part on Mr. Rothrock's testimony in setting out their opinions as to the scope of infringement and the amount of damages.

On June 23, 2020, Match provided BT with an Excel spreadsheet that referred to "alotta" and "otheralgoid," and appeared to relate to the extent to which various algorithms were used in Match's programs. On June 25, 2020, Match served an Errata Sheet for Mr. Rothrock's deposition in which Mr. Rothrock revised positions he had taken regarding the use of the Alotta89 and Almaranth algorithms in Match's accused dating platform, particularly with respect to whether Match had discontinued the use of those algorithms in its current programs. On June 26, 2020, Match served Mr. Green's expert report on damages. His report relied on the Excel spreadsheet and on communications with two Match employees in support of his conclusion that the accused algorithms were not used, or were not used extensively, in Match's current programs. Based in part on that finding, Mr. Green concluded that the amount of damages, if liability were established, should be much smaller than the amount estimated by BT's expert.

BT contends that Mr. Rothrock's Errata Sheet is simply an effort to "abrogate and reverse" the admissions made by Match's Rule 30(b)(6) witness and should be excluded. Dkt. No. 215, at 2. BT argues that it has been prejudiced by Mr. Rothrock's about-face on the answers he gave to certain questions at his deposition. The prejudice, according to BT, stems from the fact that BT's experts relied on Mr. Rothrock's admissions in their reports and from the fact that BT purportedly forwent follow-up discovery concerning the new Match program to which Mr. Rothrock alluded in his Errata Sheet. In arguing that the Errata Sheet should be excluded, BT relies on the leading Third Circuit case on the propriety of permitting contradictory errata under Federal Rule of Civil Procedure 30(e) in the summary judgment context, *EBC, Inc. v Clark Building Systems, Inc.*, 618 F.3d 253 (3d Cir. 2010). In *EBC*, the Third Circuit directed district courts to apply a "flexible

approach" in determining when to permit or exclude a contradictory errata sheet. *Id.* at 267; *see also id.* at 268 ("[W]e emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant.").[1]

Match responds that Mr. Rothrock's Errata Sheet corrected a mistake in his deposition testimony as to whether the Match.com system currently uses the Alotta89 algorithm. Match argues that Mr. Rothrock was required to be prepared to testify on numerous topics. As part of Mr. Rothrock's preparation, Match contends, he was required to familiarize himself with the use and operation of a large number of other algorithms "rather than focusing on the only one (unbeknownst to Match) BT actually cared about." Dkt. No. 216, at 3. Moreover, Match notes that Mr. Rothrock had to conduct his preparation for the deposition remotely. While Match contends that Mr. Rothrock prepared "in good faith and as thoroughly as possible under the circumstances," Match asserts that Mr. Rothrock understandably made a mistake during his deposition in light of the numerous topics for which he had to prepare and the challenging circumstances surrounding his preparation.

Match further argues that it was not until June 5, 2020, when BT served its expert's infringement report, that BT disclosed its theory of infringement based solely on Match's use of the Alotta89 algorithm. At that time, according to Match, BT asserted that Alotta89 served as both

[1] BT does not specifically contend that the errata sheet was not served before the deadline set by the Federal Rules. But BT says that Match "waited more than one month to alert BT to the need to dramatically alter his testimony through the errata process." Dkt. No. 215, at 4. Under Rule 30(e), Match had to submit any changes to the deposition within "thirty days after being notified by the officer that the transcript is available for review." *EBC*, 618 F.3d at 265 (quotations omitted). Mr. Rothrock's errata sheet was timely submitted because Match received notice on May 26, 2020, Dkt. No. 216-1, Ex. B (Rothrock Dep. Tr.), at 201, and submitted the errata sheet on June 25, 2020.

the "first set of rules" and the "second set of rules" required by claim 10 of the asserted patent. Match argues that upon investigating that theory, it concluded that Alotta89 was used only in certain Match.com features until 2019 and that it is not used in Match's current "real-time architecture," known as "Discover." In its response letter, Match attaches a declaration from Mr. Rothrock in which he points to evidence that he says bolstered his conclusion that he had incorrectly said Match continued to use Alotta89 in its current programs. Dkt. No. 216-1, at 4–5.

According to Match, Mr. Rothrock's Errata Sheet is not an "about face" or a "clawback of a glaring admission," as BT contends, but simply reflects "a misstatement about a particular one of several triangulation algorithms Match has implemented." Dkt. No. 216, at 3. While that misstatement may affect the scope of damages for ongoing infringement (or lack thereof), Match contends that it does "not affect BT's infringement theory." Dkt. No. 216, at 2. Finally, Match contends that materials produced to BT prior to the deposition should have alerted BT to the fact that Mr. Rothrock's statements in the deposition were wrong and that his corrections to his testimony accurately described the change in the algorithms used in Match's current systems.

With respect to the governing legal standard, Match argues that the *EBC* case on which BT relies does not require a court to strike an errata sheet that makes substantive changes in the witness's testimony if sufficiently persuasive reasons are given for the change, or if other circumstances satisfy the court that amendment of the testimony should be permitted. Dkt. No. 216, at 4 (citing *EBC*, 618 F.3d at 270).

"[C]ourts, particularly the Third Circuit, are reluctant to limit the filing of erratas[.]" *Acceleration Bay LLC. v. Activision Blizzard, Inc.*, No. CV 16-453, 2017 WL 11517421, at *5 (D. Del. Nov. 7, 2017). "[I]t is within the discretion of the Court to allow substantive changes to deposition testimony." *Novartis AG v. Actavis Elizabeth LLC*, No. CV 14-1487, 2017 WL

1398347, at *2 (D. Del. Apr. 17, 2017) (citing *EBC*, 618 F.3d at 268). Exercising that discretion and applying the flexible approach recognized by the Third Circuit in *EBC*, I find that the circumstances, including the explanation for Mr. Rothrock's erroneous testimony, justify his submission of the Errata Sheet under Rule 30(e).[2]

Some of the changes in the Errata Sheet are ministerial errors that do not appear to be in dispute. Most of the remaining changes—and the only ones that BT has focused on as being in dispute—relate to the same issue: whether, and to what extent, the Alotta89 algorithm is used in the current Match.com platform. According to Match, Mr. Rothrock was simply mistaken in thinking that the algorithm was used in the company's current programs, when in fact it is not. Despite their best efforts to prepare, sometimes witnesses make erroneous statements during their depositions. Rule 30(e) is sufficiently flexible to permit a witness, in certain situations, to submit an errata sheet that contradicts and fixes his or her prior testimony. As one court in the Third Circuit has noted, Rule 30(e) can "further[] the purpose of the discovery process—to allow the parties to elicit the true facts of a case before trial," when implemented with "adequate safeguards to prevent abuse, including maintaining a record of the changes." *ConsulNet Computing, Inc. v. Moore*, 631 F. Supp. 2d 614, 626 (E.D. Pa. 2008) (citation and quotations omitted).

---

[2] The parties have not addressed whether the governing legal standard might be more lenient outside the summary judgment context. At least one court in this district has suggested that the standard in *EBC* was heightened because the contradictory changes in that case were made to defeat summary judgment. *See Alcon Research Ltd. v. Barr Labs. Inc.*, No. 09-CV-0318, 2011 WL 13135574, at *3 (D. Del. Oct. 25, 2011). And in at least one non-precedential opinion, the Third Circuit noted that "Rule 30(b)(6) testimony binds a corporation in that it is 'deemed to be the testimony of the corporation itself,' not 'something akin to a judicial admission.' . . . As testimony, it may be contradicted [by the corporation] . . . at trial[.]" *Hanna v. Giant Eagle Inc*, 777 F. App'x 41, 42 (3d Cir. 2019) (quoting *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008)). I need not address whether the Third Circuit would adopt a more lenient standard outside the summary judgment context because I find the circumstances of this case warrant the acceptance of Mr. Rothrock's errata under the *EBC* standard.

As noted, the Third Circuit has adopted a "flexible approach" to contradictory errata, allowing district courts in their discretion to permit such changes "if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted." *EBC*, 618 F.3d at 270; *see also id.* at 268 ("[W]e emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant.").

While I am not in a position to definitively say whether Match's contention about the algorithms used in its current programs is true, I am persuaded that Match is entitled to maintain the truth of its assertion and not be foreclosed on that important point in the case by what may have been a misapprehension of fact on the part of one of its Rule 30(b)(6) witnesses.

Although the parties dispute the number of different issues on which Mr. Rothrock was required to prepare for his deposition, it is clear that he was required to prepare on a large number of issues and did not have his attention focused by BT, prior to the deposition, on the issues that now appear to be of central importance in the case. In addition, Mr. Rothrock had to prepare for his deposition under difficult circumstances, including having to consult remotely with others in the company. Mr. Rothrock understandably could have made a mistake during his deposition in light of the numerous topics and challenging circumstances in which he was forced to prepare. Given those circumstances, I will not disregard Mr. Rothrock's errata.

While BT is skeptical that the changes in Mr. Rothrock's testimony are the result of a good faith mistake on his part, I am not persuaded by the evidence presented to me that Mr. Rothrock's original testimony and the changes set forth in the Errata Sheet were the product of bad faith. Moreover, Match has pointed to additional evidence to support Mr. Rothrock's assertion that he

made a mistaken assertion during his deposition. *See* Dkt. No. 216-1, at 4–5. While the evidence Match identifies is not conclusive, it bolsters Match's assertion that Alott89 was discontinued and further cautions against disregarding Mr. Rothrock's errata. *EBC*, 618 F.3d at 269 ("when there is independent evidence in the record to bolster an otherwise questionable affidavit [or errata sheet], courts generally have refused to disregard the affidavit" (citation and quotations omitted)).

BT will likely suffer some prejudice as a result of Mr. Rothrock's change in his testimony, but BT overstates the degree of that prejudice. Further, I believe that any prejudice can be cured. To begin with, in assessing the degree of prejudice, the question is not how much BT's position will suffer if the Errata Sheet is accepted; rather, the proper measure of prejudice is logically the extent to which BT has been disadvantaged by the correction of Mr. Rothrock's testimony, compared to what the situation would have been if Mr. Rothrock had given the answers in his deposition that he has now proffered in his Errata Sheet.

If Mr. Rothrock had originally testified in accordance with the position taken in his Errata Sheet, BT would have had to prove the contrary in order to support its theory that the Alotta89 algorithm has been used in the accused Match.com dating platform up to the present time. To the extent BT was not prepared to prove its case without Mr. Rothrock's admissions, it suffered no real prejudice just because it is unable to rely on the windfall of his original testimony. In any event, BT is certainly not entitled to conduct a "full forensic discovery of Match's source code" that would take "several months to complete" when BT would have had only three days of fact discovery to develop a response to Mr. Rothrock's deposition assertions if Mr. Rothrock had originally testified in accordance with the position taken in his Errata Sheet  Dkt. No. 215, at 5. Moreover, in one respect BT is better off than it would have been if Mr. Rothrock had originally testified in accordance with the position taken in his Errata Sheet:  Mr. Rothrock's original

testimony will remain of record, and BT will be able to use the change in Mr. Rothrock's testimony for impeachment or contradiction, as it chooses.

BT further complains that it has been prejudiced because it will be required to make changes in its experts' reports to take account of Mr. Rothrock's change of position, and that there is not enough time in the case schedule to repair the damage. While BT has no doubt been adversely affected by Mr. Rothrock's change in position, the effect can be cured by appropriate measures to put BT in the same position it would have been in if Mr. Rothrock had testified in accordance with the substance of his Errata Sheet.

To that end, I will order the following curative measures: First, Match will be ordered to make Mr. Rothrock available for a further deposition of no more than three hours, if BT wishes it. The deposition must be completed by July 27. Any such supplemental deposition of Mr. Rothrock will be limited to the topic of Mr. Rothrock's errata sheet changes. Second, BT will be allowed to revise its expert opinions to the extent that they relied on Mr. Rothrock's original testimony regarding the current algorithms used in the accused Match.com dating platform. The revisions to BT's expert reports will be due by July 30; Match will then be given until August 6 to make any necessary changes in its rebuttal expert report. Third, the parties are directed to meet and confer to determine whether any additional changes to the scheduling order are necessary in light of this order, and if the parties jointly, or separately, wish to change the schedule, I will entertain a motion to that effect. I anticipate that any resulting change in the scheduling order will be minor and will not interfere with the orderly and efficient trial of the case as currently scheduled. Fourth, Match is directed to immediately provide BT with access to the source code that reflects the current algorithms used in the accused Match.com dating platform. Finally, Mr. Rothrock's original testimony will remain of record, and BT will be able to use the change in Mr. Rothrock's testimony

for impeachment or contradiction, as it chooses. With those remedial measures in place, I am satisfied that any prejudice flowing from Mr. Rothrock's Errata Sheet will be substantially cured. *See EBC*, 618 F.3d at 267–68 (endorsing the use of cross-examination and the reopening of a deposition as sufficient remedial measures when allowing contradictory changes); *Novartis*, 2017 WL 1398347, at *2 ("Any prejudice to Defendants stemming from Mr. Waibel's changed testimony has already been addressed by Mr. Waibel's second deposition, in which Defendants had the opportunity to question him about his changes, and may further be alleviated by cross-examining him at trial." (citations omitted)); *Acceleration Bay*, 2017 WL 11517421, at *5 (rejecting challenge to errata sheet submitted after opening expert reports were served and noting that "[o]ne reason, besides the *Pennypack* factors, as to why courts are reluctant to strike erratas is that the moving party has an opportunity to test the witnesses' credibility at trial.").

In sum, I am persuaded that it is neither necessary nor appropriate to strike Mr. Rothrock's Errata Sheet. Applying the "*Pennypack* factors" set forth by the Third Circuit in *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977), to the issue of whether the Errata Sheet should be excluded, I conclude that (1) the Errata Sheet has caused some surprise and prejudice to BT; but (2) it is possible to largely cure that prejudice by mitigating measures; (3) there is sufficient time before trial, which is now scheduled for November 30, 2020 (assuming that the COVID-19 pandemic does not require that the trial date be continued), to accommodate these mitigating measures; (4) I have not seen sufficient evidence, in light of all the circumstances, that the change in Mr. Rothrock's testimony was the product of bad faith or willful misdirection; and (5) the evidence in question is important in the case. *See also Acceleration Bay*, 2017 WL 11517421, at *5 ("the 'Pennypack' factors impose a heavy burden of the party seeking

to strike erratas. A moving party must show it sustains prejudice and show some degree of bad faith by the other party."). The request to exclude the Errata Sheet is therefore denied.

**2. The Excel Spreadsheet**

BT next objects to an Excel spreadsheet that was served on BT on June 23, 2020, and was relied on in Match's expert report on damages. BT argues that the production of the spreadsheet after the close of fact discovery was improper, and that to the extent the spreadsheet relates to the use of the accused algorithms, it should have been produced in response to discovery requests as early as September 2019.

Match answers that the spreadsheet was not in existence during fact discovery, but was created in June 2020, after Match received BT's damages report alleging Alotta89's importance to Match.com's revenues. At that point, Match generated the spreadsheet, which according to Match reflected the number of communications between users generated by Alotta89 over time. The spreadsheet, again according to Match, was prepared at the direction of counsel and was produced to BT "almost immediately after it was created." Dkt. No. 216, at 5. In addition, Match alleged in its response letter that the spreadsheet reflected the contents of previously produced business records. *Id.*

BT replies that even if the spreadsheet was prepared after the close of fact discovery, the data in the spreadsheet was in Match's possession all along and should have been produced in response to BT's discovery requests.

Given Match's uncontradicted representation that the spreadsheet was not generated until June 2020 and that it was produced to BT shortly after it was created, Match cannot be faulted for failing to produce the spreadsheet earlier. No sanction is appropriate, therefore, for the timing of the production of the Excel spreadsheet.

The only remaining question is whether Match failed to produce the underlying data reflected on the spreadsheet on a timely basis. BT first challenged Match's purported failure to produce the underlying data in BT's reply, where BT makes a two-sentence argument that Match should have produced the underlying data in response to earlier discovery requests. Dkt. No. 2017, at 3 ("More importantly, the untimely spreadsheet relies on underlying data that Match failed to produce during fact discovery. Match admits that it had the underlying data all along; that data should have been produced earlier in response to discovery requests served in September 2019."). In its earlier letter, Match argued that "previously produced business records contain similar information comparing Alotta89's effectiveness relative to other algorithms." Dkt. No. 216, at 5.

Because BT challenged the sufficiency of Match's production of documentary materials underlying the Excel spreadsheet for the first time in its reply letter, I have insufficient information to determine whether that is the case. However, because it is apparent that the role of the Alotta89 algorithm has recently assumed a significant role in the case, I will direct Match to immediately produce any materials in its possession that provide the basis for the information in the Excel spreadsheet that was served on BT in June 2020. In addition, I will direct that Match make available for depositions the two Match employees whom Match's damages expert consulted in order to understand the information contained in the spreadsheet. Those two individuals, Todd Carrico and Mr. Brett Beattie, should be made available for depositions of no more than three hours each, if BT wishes to conduct them. Those depositions must be completed by July 27.

**3. Mr. Green's Report**

BT's third complaint is that in his expert report on damages, Mr. Green relied on conversations with Mr. Carrico and Mr. Beattie to support some of the conclusions in his damages

report. BT argues that because those two employees were not identified as witnesses or persons with knowledge regarding the case, those portions of Mr. Green's expert report should be stricken.

Match responds that the two employees are not expected to be called as witnesses, and that Match was therefore not required to identify them as part of its discovery obligations. As Match points out in its response letter, Match is not required to divulge the name of every one of its employees (or others) who has information that might be relevant to the case; it is required only to divulge the identity of those persons who may be used to support its claims or defenses, unless the use would be solely for impeachment. Fed. R. Civ. P. 26(a); Dkt. No. 216, at 5.

In its reply letter, BT relies on the language of Rule 26(a)(1)(A)(i), which requires a party to disclose the identity of a person likely to have discoverable information that the disclosing party "may use to support its claims or defenses." Dkt. No. 217, at page 3. Although BT does not suggest that Match was obligated to disclose the identity of Mr. Carrico and Mr. Beattie as prospective witnesses, it nonetheless contends that Match "used" them, within the meaning of Rule 26(a) when Mr. Green made reference in his report to conversations he had with them. *Id.*[3] For

[3] It is by no means clear that Mr. Green's reference in his damages report to his conversations with Mr. Carrico and Mr. Beattie constitute a "use" of Mr. Carrico and Mr. Beattie within the meaning of Rule 26(a)(1)(A)(i). The language of that provision was added to Rule 26 in 2000, and the purpose of the amendment was to narrow the broad disclosure requirement of the prior version of the rule. *See* Fed. R. Civ. P. 26(a)(1)(A) advisory committee note to 2000 amendment ("A party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use."). Although the advisory committee's note to the 2000 amendment makes clear that the "use" of documents or witnesses was meant to include "any use at a pretrial conference, to support a motion, or at trial," neither the language of the rule nor the advisory committee's note provides guidance as to whether the initial disclosure requirement applies to the identity of an employee of a party with whom the party's expert consults during the preparation of the expert's report. In its reply letter, BT cites one case for the proposition that consulting such an employee constitutes such a "use," *see United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, Civil Action No. 2:18-cv-366, 2019 WL 7041725, at *4 (E.D. Tex. Dec. 20, 2019), but in that case the defendant did not argue that the expert's conversations with the party's employees were not a "use" within the meaning of Rule 26(a)(1)(A)(i), *see id.*, Dkt. No. 145, at 7-9. Accordingly, the court did not address that issue.

that reason, BT argues, the failure to identify them violated Rules 26(a)(1)(A)(i) and (e), and the portions of Mr. Green's report that refer to Mr. Carrico and Mr. Beattie should be stricken.

Because BT's special focus on the Alotta89 algorithm became apparent only after Mr. Rothrock's deposition and the filing of BT's expert report in June 2020, the "use" of Mr. Carrico and Mr. Beattie by Match's damages expert arose only at the time that the Excel spreadsheet was prepared and while Mr. Green was preparing his rebuttal damages report. Therefore, I see no discovery violation from Match's failure to identify Mr. Carrico and Mr. Beattie under Rules 26(a) and (e) any earlier than that time. To the extent there was a failure to comply with Rules 26(a) and (e), the failure was substantially justified under those circumstances, and any resulting prejudice will be cured by the remedial measures set forth in this order. Moreover, as Match points out, Mr. Carrico's identity was previously disclosed much earlier, in response to an interrogatory.

This Memorandum Opinion and Order was filed under seal because the parties filed their letters under seal, and it was unclear what particular information the parties regarded as sensitive. Given the strong policy against non-public judicial proceedings, however, I will revisit the question of sealing. Accordingly, within seven days of the filing of this order, each of the parties shall advise the Court whether they believe any portions of this order need to remain sealed. If either party does not object to the unsealing of this order, that party can so advise my law clerk, Ryan Teel, by email at teelr@cafc.uscourts.gov. If either party objects to the unsealing of the order, in whole or in part, that party should so indicate in a filing with the court. With respect to any portion or portions of the order that a party believes should remain under seal, that party should explain, with specificity, why sealing that portion or portions of the order is necessary and justified.

IT IS SO ORDERED.

SIGNED this 15th day of July, 2020.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE